36 C.C.P.A. (Patents)

### WILSON v. GOLDMARK.

#### Patent Appeals No. 5499.

United States Court of Customs and
Patent Appeals.

Feb. 1, 1949.

John A. Harvey, of New York City
(Francis W. Crotty, of New York City, and
Miles D. Pillars, of Washington, D. C., of
counsel), for appellant.

Pennie, Edmonds, Morton & Barrows, of
New York City (Willis H. Taylor, Jr., and
Harold A. Traver, both of New York City,
and Clarence M. Fisher, of Washington,
D. C., of counsel), for appellee.

Before GARRETT, Chief Judge, and
HATFIELD, JACKSON, O'CONNELL,
and JOHNSON, Judges.

JOHNSON, Judge.

This is an appeal in an interference pro-
ceeding from a decision of the Board of
Interference Examiners awarding priority
of invention to appellee on each of the four
counts involved.

The interference concerns an application
of John C. Wilson (deceased), Serial No.
355,547, filed September 6, 1940, and an
application of appellee, Serial No. 355,840,
filed September 7, 1940.

Count 1 is considered sufficiently illus-
trative. It reads as follows:

"1. An interlaced multiple-color televi-
sion scanning system comprising, means

for periodically scanning the image to be transmitted or reconstructed in frames of $n$ interlaced fields, and means for periodically changing the color of illumination associated with successive fields not greater than $m$ times per field and in a series of $m$ colors, the ratios of $n$ to $m$ and of $m$ to $n$ both being nonintegral so that corresponding fields of successive frames are associated with illumination of different colors."

The invention in issue is for an interlaced multiple-color television scanning system comprising a plurality of interlaced field scansions together with a plurality of primary colors in a manner and relation such that reproduction of the images is secured with good color rendition and good detail without requiring the use in transmission of an excessive band width.

The party Wilson died before the interference was declared, and proceedings are prosecuted by his administrator, Charles E. Dean, in behalf of Wilson's assignee, the Hazeltine Corporation (also variously referred to as the Hazeltine Service Corporation, Hazeltine Research Corporation, and the Hazeltine Electronics Corporation). For convenience the name of Wilson will be used in referring to the appellant hereafter in our discussion of the case.

■ Wilson was the senior party and Goldmark the junior party, so on the latter rests the burden of proof.

The Board of Interference Examiners held that Wilson conceived the invention in issue on March 25, 1940, and that he had a constructive reduction to practice through the filing of his application for a patent on September 6, 1940; that appellee established conception of the invention on May 28, 1940, and reduction to practice prior to September 6, 1940. The holding of the board was that Wilson's case must fail for a lack of adequate and satisfactory showing of diligence, and the board awarded priority of invention of the subject matter in issue to the appellee.

Appellant does not traverse the board's finding that Goldmark is entitled to May 28, 1940, as the date of conception, or that Goldmark actually reduced to practice prior to appellant's filing date of September 6, 1940.

The record shows that appellee reduced the invention in issue to practice on May 28, 1940. This is shown by the testimony of Goldmark and by his notebook entries of that date, as well as by the testimony of Mr. Adrian M. Murphy, a vice president of the Columbia Broadcasting System, and the testimony of Mr. John N. Dyer, a colleague of Goldmark's in the television laboratory at Columbia Broadcasting System.

The pertinent portions of Goldmark's testimony are as follows:

"Q. 131. Dr. Goldmark, will you look at the entry appearing in your notebook at page 12059, under date of May 28, 1940, and explain if you will the significance and meaning of the statements and, as well, the sketches and computations as they appear on that page? And, of course, first I will ask you to state whether or not you made that entry on May 28, 1940? A. That entry was made on May 28, 1940. On that date, as shown on the top of the page, I realized that the triple interlacing unnecessarily reduced the available definition for given band widths, in so far as not each line of the picture is covered in all colors. So I proposed double interlacing and three colors, retaining the 120 fields per second, * * *.

\*       \*       \*       \*       \*       \*

"This scheme was immediately tried out, using the values for the synchronizing generator as shown on the bottom of the page, and this scheme was found to be most satisfactory with 343 lines, because this gave maximum utilization of the 4.25 megacycle video band. By the observers, and by myself, this scanning scheme was found to be most satisfactory and was retained from there on.

"Q. 132. I show you the drawings which accompany your application here involved in interference, Goldmark Exhibit 1, filed September 7, 1940, Serial No. 335,840, and direct your attention to Fig. 2 thereof, and I will ask you to compare that with the sketch appearing at the top of page 12059 of your notebook, immediately under the phrase 'double interlacing required as follows and tried out.' A. Yes, this drawing, Fig. 2 of the patent application referred

to is substantially the same as the sketch shown at page 12059 of my notebook.

"Q. 136. Do you recall demonstrating the operation of the equipment in accordance with the mode indicated at page 12059 of your notebook to any of your associates in the laboratory? A. Yes, I do.

"Q. 137. Can you name the gentlemen to whom you have referred? A. Dr. Piore, John Hollywood, John Dyer, and Adrian Murphy.

"Q. 152. Now, Doctor, will you keep in mind the arrangement that you have described at page 12059 of your notebook under date of May 28, 1940, Goldmark Exhibit 14 for identification, and tell me on what day that arrangement was actually operated in an apparatus and demonstrated to others? And I call your particular attention in that connection to the words 'tried out' which appear on your notebook page of that day. A. It was tried out on May 28th.

"Q. 153. Now, can you characterize the results obtained with the arrangement described at page 12059 on the apparatus as you have described it with respect to the appearance of the image and the presence or absence of color flicker? A. The scheme shown on page 12059, namely double interlacing, 120 fields per second, showed freedom from flicker and fairly good interlacing and seemed like the most satisfactory solution obtained thus far."

The pertinent portions of Mr. Adrian Murphy's testimony are as follows:

"Q. 84. Now was there any demonstration made to you, Mr. Murphy, between the date which you have stated, which is some time in March, 1940, and the date which you say was July 30, 1940, at the time the color television development of Dr. Goldmark was exhibited to Chairman Fly? A. Yes. There was a demonstration made to me by Dr. Goldmark at the end of May, 1940.

"Q. 85. How do you fix that date, Mr. Murphy? A. On May 29th I traveled to Washington with my then direct superior, Paul W. Kesten, to talk with Chairman Fly of the Commission about a number of matters; and immediately upon the conclusion of the luncheon discussion I made

detailed notes on the train returning to New York, and subsequently transcribed those notes in full form, and they are in the file."

The record discloses that the notes mentioned in the answer to Question 85, supra, were received in evidence as Goldmark Exhibit 45 for identification.

"Q. 91. Will you observe the notes which appear at page 3 of the collection here identified as Goldmark Exhibit 45 for identification, and particularly the phrase 'We have seen color television in our own laboratory—I haven't but Mr. Murphy has.' What was the purport of that entry, and who is the person who is purported to have said, 'I haven't, but Mr. Murphy has'? A. Paul W. Kesten is the gentleman who made the statement. He was then my direct superior. He was vice-president of Columbia Broadcasting System at that time.

"Q. 92. To whom did Mr. Kesten make that statement? A. He made it to the then chairman, James Lawrence Fly of the Federal Communications Commission, and to Mr. Harry Butcher, who was then CBS Washington vice-president and to me.

"Q. 93. Where was that statement made, Mr. Murphy? A. It was made in the restaurant in Union Station at Washington. We had lunch in the restaurant there because—I have forgotten whether the train was late or whether Mr. Fly had other commitments which required a very quick lunch, but we got off the train, went right to the restaurant there, had our lunch, and when the luncheon meeting was over we returned on the next available train.

"Q. 94. Now will you tell me to what demonstration Mr. Kesten referred; was it one that had been recently made to you by Dr. Goldmark, or had it been a demonstration of some time previous? A. No, it was a demonstration of a few days previous, a day or a week—I don't know which it was, but it was just a bit previous * * *."

The pertinent portion of Mr. John N. Dyer's testimony is as follows:

"Q. 64. Now, could you tell me, Mr. Dyer, by reference to the date of your

requisition, June 7, 1940, Goldmark Exhibit 17a * * * approximately how long before the date June 7, 1940, had you achieved satisfactory operation, as you have described, with the apparatus of Goldmark Exhibits 16a and 16b with the use of three colors, double interlace, 120 fields? A. Well, I can only guess at that because I cannot firmly fix that. However, it was an appreciable time. That is, we could easily have been working with that for a month or thereabouts."

The record is replete with evidence of continued demonstrations and perfection of the invention throughout the period extending from May 28 down to appellee's filing date of September 7, 1940.

In view of the foregoing testimony, we decide that appellee is specifically entitled to May 28, 1940, not only as his date of conception, but also as the date he actually reduced to practice. Appellant therefore is required to show that he displayed reasonable diligence throughout the period extending from just prior to May 28, 1940, to his filing date of September 6, 1940.

The appellant's sole contention here has been that the board was in error in concluding that his case fails for lack of an adequate showing of diligence during the critical period from just prior to May 28 to September 6, 1940. Appellant agrees that our review of the issue of Wilson's diligence will be dispositive of the case.

The evidence discloses that Wilson was an employee of the Hazeltine Corporation subject to the terms of an assignment document required of all engineers in the employ of that corporation providing for the assignment of his inventions to the corporation; and that all inventions made by the engineers in the employ of the Hazeltine Corporation, with but few exceptions (the invention in issue not being among the exceptions) were assigned to the corporation or owned by it.

The diligence of the Hazeltine Corporation is therefore also in issue. The record is replete with evidence showing that the Hazeltine Corporation assumed control of the Wilson invention almost from the moment of conception, and that this control was manifested by the scheduling of a con-

ference on May 15, 1940, in which the novelty of Wilson's idea was discussed; by the exercise of executive authority over the invention by Mr. Lawrence Dodds, an official of the Hazeltine Corporation and head of the patent law office which under a retainer from the Hazeltine Corporation handled its patent work; by the assignment of priority, preparation of application papers, etc.

It is plainly evident from the record that the Hazeltine Corporation was the real party in interest, and that it continuously exercised dominion and control over the processing of the Wilson idea from conception to application.

The conference held May 15, 1940, above referred to, was attended by Mr. Daniel E. Harnett, an engineer in the employ of the Hazeltine Corporation, and at the date mentioned chief engineer in charge of laboratory work; Mr. A. V. Loughren, an engineer in the employ of the Hazeltine Corporation; Mr. Wilson, the applicant, and also an engineer in the employ of Hazeltine Corporation; and Mr. Harry C. Page, a patent attorney in the employ of Mr. Lawrence B. Dodds, hereinbefore referred to, and also carried on the payroll of the Hazeltine Corporation. Following the conference a memorandum was prepared by Mr. Page, dated May 17, 1940, describing the Wilson idea. The memorandum, signed by Mr. Page and approved by Mr. Dodds, bore the notation "Class C." A copy of this memorandum was sent to Mr. Wilson on May 22, 1940, the day after it was approved by Mr. Dodds.

It is not entirely clear from the record what the exact meaning of "Class C" on this memorandum was; however, Mr. Page testified on direct examination concerning its significance:

"Q. 44. I notice on Wilson Exhibit 3 for Identification [the memorandum dated May 17, 1940, above referred to] a notation 'Class C.' Can you explain what that means? A. That relates to a classification which has been used in Hazeltine for some time to expedite the handling of the various subject matters under consideration from the patent standpoint. This classification has been very loosely used to designate a

variety of different things. Hazeltine was primarily interested in 1940 in subject matters relating to the broadcast field. Hazeltine was much less interested during that period in subject matters relating to the broadcast techniques, and by this I mean transmitters. *Hazeltine was interested in television at that time, but only as a future commercial possibility. Hazeltine was interested in color television at that time, but to a somewhat lesser degree than black and white television* for the reason that the use of color television seemed somewhat more remote commercially. Therefore, in many of our prior considerations, the subject matters were classified, A, B, C, and D merely on the field in which they related. At other times the same classifications had been used to indicate the degree of novelty which a proposal might have. *In still other instances the classification might be used to designate what was thought to be the commercial possibilities to Hazeltine in the subject matter under consideration.* In some cases we have broken the classification down and classified subject matter A, B, C, D, under all of these considerations. *In this particular case the classification was apparently placed thereon by me with the consideration that the subject matter related to a field in which Hazeltine was not deriving advantages commercially at the moment but might well derive such advantages later.* [Italics ours.]"

Mr. Harnett, above mentioned as chief engineer in charge of laboratory work during the period of time in question, testified on redirect examination concerning the meaning of "Class C," as follows:

"RDQ 142. Mr. Harnett, I wonder if you can recall in determining the classifications about which you have testified factors other than a filing order were taken into consideration? A. Well, occasionally, as I remember it, for instance, a case might have been labeled "Class C" when there was very active work on it in the laboratory, expecting that the laboratory work should be completed first.

· "RDQ 143. Do you recall whether or not its application, say, to the field of home receivers, would have any bearing upon classification A, B or C? A. It would, yes. That is, there were several · ideas which were not in any way related to radio or television which we thought might be good ideas but *we did not give them a Class A rating, for instance, because they were not in the field we were principally interested in.*

"RDQ 144. *Do you recall whether or not the prospects of its immediate use, or remoteness of its use, would have any bearing upon its classification A, B or C?* A. Yes, it did.

"RDQ 145. In what way? ˙ A. *Well, if it did seem like an idea that would not be used or come into use fairly quickly, it would probably be labeled Class C.* [All italics ours.]"

From this testimnoy it appears clear that the Hazeltine Corporation considered the Wilson idea as belonging to the class in which it had but an indefinite or future interest, and accordingly permitted a priority to be assigned to its further consideration and processing which relegated it to an inferior position with relation to many of the other interests of the corporation.

The memorandum above referred to reads as follows:

"May 17, 1940.

MEMORANDUM FOR FILE
Docket 673—Wilson
Color Television System
CLASS C

The broad idea here is to provide a color television system in which the number of colors utilized is different from the number of fields utilized. For instance, three colors and two fields may be utilized, thereby providing a change of color for each interlace so that the picture need not necessarily be viewed from a distance sufficient to make the interlaces [analysis] [u] indistinguishable before the colors blend.

The system was considered at a conference of 5/15/40 of Messrs. Harnett, Loughren, Wilson, and Page. Mr. Harnett expressed the opinion that the arrangement is not novel. Mr. Wilson stated that he had investigated the novelty but would again go over his collection of art on color television systems. If a reference is not found by Mr. Wilson, it is suggested that

a short search be made by this office to determine the novelty.

It was recommended that an application be filed if no reference is found.

H. C. PAGE

H C P

Approved: ·

L B D 5/21/40"

In a memorandum addressed to Mr. Page on June 26, 1940, Wilson referred to the above quoted memorandum of May 17, 1940, stating:

"Memorandum to:

Mr. H. C. Page          June 26, 1940

From    J. C. Wilson          No. 242–L–D

Subject    Docket 673

With reference to your note of May 17 on the above case *I have now had an opportunity of looking over my files on color television,* and find that there has apparently been no publication so far of a scheme of this type.

*In the circumstances I suggest* (subject to your confirmatory search) *we go ahead on this case on its present basis (namely, Class C).*

J. C. WILSON ·

[Italics ours.]"

Mr. Page testified that his own search of the prior art was made between June 26 and August 6, 1940, at which later date he ordered drawings for the patent application from the draftsman.

The evidence shows that there was no time charged by Mr. Page against the Wilson invention, Docket 673, between June 26 and August 6, 1940. In connection with this, Mr. Page stated on direct examination:

"And I think it is correct that the first diary entry showing work on Docket 673 Wilson is August 6, 1940, as you have stated. However, as I have stated previously, it was not my practice to charge all of the time in the diary, and especially *it was not my practice to charge time unless the time spent approximated at least one hour.* [Italics ours.]".

Of interest here is the board's recapitulation of data appearing in Mr. Page's testimony disclosing the amount of time spent in working on other applications with higher docket numbers than Wilson Docket 673 during the period June 26 to July 30, 1940.

| Date | Docket No. | | | |
|---|---|---|---|---|
| | 677 · | 678 | 691 | 718 |
| June 26 | | | 1 hr. | |
| June 27 | | 2 | | |
| July 5 | | | 2 | |
| July 6 | | | 2 | |
| July 8 | | | 6 | |
| July 9 | | | 4 | |
| July 10 | 2 | | | |
| July 11 | 5 | | | |
| July 12 | | 2 | | |
| July 13 | 2 | | | |
| July 15 | 2 | | 2 | |
| July 18 | 3 | | | |
| July 26 | 3 | | | |
| July 30 | | | | 4 |

In connection with the assignment of docket numbers to the matters being developed by Hazeltine's engineers, the following testimony of Mr. Page is of interest:

"Q. 19. Mr. Page, I will show you a file and ask you if you can tell me what that is? A. Yes. This is one of the files of our office, it bears the docket number 673.

"Q. 20. The same number that is on Wilson Exhibit No. 2 for Identification? A. That is correct. It is a file of application serial No. 355,547, which is involved in this interference.

"Q. 21. On one of the panels of that jacket I see some initials and dates. I will ask you by reference to that panel if you can tell me when that docket was assigned to you, if, in fact, it was? A. Yes. The docket was assigned to me on March 27, 1940. That is indicated by the notation 3/27/40, followed by my initials which is made on the jacket cover opposite the printed heading 'Docket received by attorney.'

"Q. 22. Do you know what the contents of that file were as of the time you indicated there that you received it? A. I am not able to recall at this time the papers which were in the file at that time. However, *it was the practice in our organization to provide a jacket of this type as soon as a request for opening a new docket was*

*received from the engineers, but only after this request had been approved by one of the attorneys, usually Mr. Dodds.* Therefore, following the customary practice, this jacket would have contained on March 27, 1940, all the papers relating to the new docket No. 673 which was opened for Mr. Wilson. [Italics ours.]"

Appellant contends that the period of May 17 to September 6, 1940, must be considered in two divisions for the purpose of determining whether or not due diligence was displayed by Wilson: May 17 to June 26, while Wilson was checking the prior art; and June 26 to September 6, while the attorney was preparing the application. Much has been said below as well as here of the state of Wilson's health as a contributory factor to be considered in examining the apparent delay intervening from the date of conception to the date of application was filed by Wilson. We invite attention, however, to the fact that, as well revealed in the testimony and other evidence quoted above, the Hazeltine Corporation assumed control and management of the processing of the Wilson invention to the application stage, at least from the date of the conference on May 15. If the Hazeltine Corporation, Wilson's assignee and the real party in interest, was in control, as it clearly appears it was, and if it permitted the task of checking the prior art to be assigned to or assumed by Wilson, whom they knew to be in poor health, that is a defect in judgment on the part of the officers of the corporation. During this period the record reveals 17 applications in the field of radio and television being filed in behalf of the Hazeltine Corporation with the Patent Office. Obviously, Wilson was not given the task of checking the prior art on all of those applications. It cannot be that he was the only person in the Hazeltine Corporation capable of checking the invention in issue here against the state of the prior art. Attorney Page was himself given the task of rechecking the prior art after Wilson had completed his search.

The executive action of officers of the Hazeltine Corporation in assigning this function to Wilson and failing to recall the task in the face of delay caused by the state of Wilson's health will not be excused on the very grounds of his health where want of diligence during this period was critical. The task could have been assigned to some one else.

The same leisurely approach is disclosed in examining the handling given the matter after Wilson's memorandum of June 26, 1940, was received by Mr. Page. From the time record quoted above, it is established that Docket 673, the Wilson invention, was relegated to a position of inferior importance to four later numbered dockets which were given prior handling. As pertinently mentioned by the board in its decision, and by the appellee in his brief, work was not begun on one of these dockets, 677, until two weeks *after* attorney Page received the Wilson memorandum of June 26; attorney Page devoted one hour to Docket 691 on the same date that Wilson's report was received, yet nothing further was done on Docket 691 until nine days later. Docket 691 carried a "Class B" rating, and the presumption naturally follows that it received priority over Wilson's Docket 673 because of the latter's "Class C" status. Docket 718, also handled before 673, was a divisional application, and time was not of the essence in its preparation.

We agree with the board that no sufficient reason appears why the Wilson docket, 673, could not have been worked on sooner. While the evidence discloses that Wilson was ill, it also shows that he performed considerable work during this period, spending well over 50% of the normal duty time in the performance of his duties. The evidence presents a unified view of the relationship of Docket 673 to other interests of Hazeltine Corporation during the critical period of just prior to May 28, 1940, to September 6, 1940: Wilson's idea was consciously and definitely relegated to a position of lower priority to ideas originating later in time; the authority resulting in such relegation was exercised by officers of the Hazeltine Corporation.

Where an appellant has placed the entire control of his invention in the hands of an assignee for the use of that assignee, appellant must stand or fall upon

the assignee's conduct in the prosecution of the invention. Robischung v. Handiges, 36 App.D.C. 97. Where an inventor has placed the control of his invention· in the hands of another, that other party's conduct is controlling on the question of diligence. The inventor who assigns his invention, placing it under the control of another will not be heard to complain when the measure of diligence in an interference proceeding is applied to the assignee as the real party in interest. Automatic Electric Co. v. Dyson, 52 App.D.C. 82, 281 F. 586. And where an inventor's rights are assigned to his employer by reason of the terms of his employment, with the making of applications for his inventions controlled entirely by his employer, the measure of diligence will be determined by the activities of the employer. Fageol v. Midboe, 56 F.2d 867, 19 C.C.P.A.(Patents), 1117. One who is the first to conceive will not be permitted to lay his conception aside, take up, and experiment with many other problems and devices, and then be permitted to defeat an inventor who enters the field and reduces to practice while the one first to conceive is engrossed with other devices. Fageol v. Midboe, supra.

The evidence in this case places it well within the settled principles set out above. Wilson by the terms of his employment yielded control of his invention to Hazeltine. The corporation assigned to its prosecution an inferior priority compared with that assigned to other ideas and devices emerging from its engineering staff. Under a view of the evidence most favorable to appellant, the record does not disclose the exercise of due diligence by the appellant during this critical period, viz., from just prior to May 28, 1940, to September 6, 1940.

We agree with the board that the doctrine enunciated by this court in Brown, Jr. v. Barton, 102 F.2d 193, 26 C.C.P.A. (Patents), 889, is controlling on the question of whether the attorney's activities during the critical period constituted, as to Wilson's application, lack of reasonable diligence. In the Brown case, supra, the attorney had worked on eight dockets more recent in time and bearing higher numbers than the involved application. We there said in effect that the attorney's activities in taking up later dockets in preference to the one in issue would not be conclusive evidence of want of due diligence if they were adequately explained. But in point of fact, we there held that such activities were not so explained.

Appellant here attempts to distinguish his case from Brown, Jr. v. Barton, supra, by contending that he has satisfactorily explained why attorney Page held Docket 673 in abeyance while later dockets were taken up and worked on. As pointed out above, we do not consider the arguments of appellant persuasive to any conclusion other than that in accordance with the policies of the Hazeltine Corporation, the Wilson docket was not considered to be on the same level of interest and immediate value as other matters being developed in the corporation laboratories, and that the attorney's failure to proceed with the invention docketed as Docket 673 in the proper sequence of matters before him was in accordance with those policies.

The assignment of an inferior priority classification to a patentable idea by the real party in interest because other matters were then considered of greater importance will not be permitted to penalize one who enters the field and reduces the same idea to practice while the idea of the party prior to conceive is held in abeyance and not reduced to practice solely because other matters later in time but considered by the corporate assignee higher in priority occupied the attention of the attorney who was to prepare the application.

Other issues raised in the case need not be considered. On the critical issue of diligence, the appellant's case fails, and for the reasons set forth above, we affirm the decision of the Board of Interference Examiners.

Affirmed.