53 CCPA

**Dalton H. PRITCHARD, Appellant,**

v.

**Donald RICHMAN, Appellee.**

**Patent Appeal No. 7597.**

United States Court of Customs
and Patent Appeals.

May 19, 1966.

Rehearing Denied July 28, 1966.

William H. Meagher, Princeton, N. J., Robert A. Linger, Washington, D. C. (A. Russinoff, Princeton, N. J., of counsel), for appellant.

Edward A. Ruestow, Little Neck, N. Y. (Jesse C. Bowyer, Washington, D. C., of counsel), for appellee.

Before RICH, Acting Chief Judge, MARTIN, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

ALMOND, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention as to counts 1 through 6, the only remaining counts of interference No. 90,260, to Donald Richman, the senior party.

Richman is involved in the interference on his application serial No. 359,734 filed June 5, 1953 and assigned to Hazeltine Research, Inc. Dalton H. Pritchard, the junior party, is involved on the basis of patent No. 2,830,112, issued April 8, 1958 on an application filed May 26, 1954 and assigned to Radio Corporation of America (RCA). Counts 1, 2, 3, 4, 5 and 6 correspond to claims 1, 9, 10, 11, 12 and 13, respectively, of the Pritchard patent.

Two issues are raised by the appeal. The first is whether priority testimony introduced by Pritchard with respect to counts 1, 2, 4, 5 and 6 fails, as ruled by the board to prove completion of the invention of those counts prior to Richman's filing date. The other issue is whether the board erred in agreeing with the examiner that Richman's application discloses the subject matter of count 3.[1]

The invention relates to circuitry for use in color television receivers. Considered broadly, the circuitry demodulates, or detects, two color signals from the received color signal and then combines them to provide three color signals having different characteristics which are suitable for use in producing the color picture.

Counts 1 and 3 are representative:

1. In a color-television receiver, said color-television receiver adapted to receive a color-television signal, said color-television signal including a color subcarrier containing a plurality of color signals, each of said color signals corresponding to a predetermined signal phase, matrix means adapted to accept a first plurality of signals corresponding to a first group of predetermined signal phases in said color subcarrier to yield a second plurality of signals corresponding to a second group of predetermined signal phases, said matrix means comprising in combination, a plurality of transmission networks, each of said transmission networks having a first control electrode, a second control electrode and an output electrode, a mutual impedance coupled to the first control electrode of each of said transmission networks to cause any signal developed in one transmission network to drive each of the other transmission networks, means for coupling each of said

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

1. Pritchard additionally appears to question Richman's right to make counts 1, 2, 4 and 5 as an alternative to his argument on the first issue as to those counts and that matter will also be considered.

plurality of signals to the second control electrode of a prescribed group of said transmission networks corresponding in number to said first plurality of signals, means for utilizing said mutual impedance to produce signal addition of determinable amplitudes and polarities of said first plurality of signals at the output terminals of each of said transmission networks to cause each signal of said second plurality of signals to appear at the output terminal of one of said plurality of transmission networks.

3. In a color-television receiver adapted to receive at least a chrominance signal, the combination of demodulator means to demodulate a first and second color-difference signal from said chrominance signal corresponding to information at determinable angles of said chrominance signal, a trio of electron stream devices each having output circuits and coupled to cause modulation introduced in one electron stream to provide corresponding modulations in the other electron stream devices, means for modulating the electron streams of a pair of said trio with said first and second color-difference signals respectively, means for causing signal addition in each of said trio due to said coupling to develop each of a trio of color-difference signals corresponding to angles of said chrominance signal other than the angles corresponding to said first and second color-difference signals in each output circuit.

The record shows that although red, blue and green color signals are derived from the scene being viewed in color television, they are not transmitted as they come from the color cameras. Instead, they are compounded to produce a luminance signal and a chrominance modulated color subcarrier signal, and those signals are transmitted to the receiver. The luminance signal Y, although it is made up of predetermined proportions of the original red, blue and green signals, is actually representative of the brightness rather than color and is used to produce the black and white picture in a black and white receiver. The chrominance subcarrier is modulated in phase and amplitude with two color difference signals representative of the hue and saturation of the color. Theoretically, those color difference signals could be red and blue color difference signals, R–Y and B–Y, which after being demodulated from the chrominance subcarrier signal in the receiver can be added or matrixed to provide additionally a green color difference signal, G–Y. The red, blue and green color difference signals, which Pritchard describes as representing information relating to the corresponding color component *"minus* information as to the 'luminance' or brightness,"* are used to produce the color picture on a tri-color picture tube.

The specifications of both parties describe a system in which the chrominance subcarrier signal, instead of being modulated by red and blue color difference signals, is modulated by signals representative of color difference along orange-cyan and green-purple axes which are displaced 90 degrees in phase and are designated I and Q signals, respectively.[2]

The parties demodulate the received chrominance subcarrier signal to obtain two color difference signals other than the red and blue color difference signals [3] and then combine or matrix those two signals to obtain the three color difference signals R–Y, B–Y and G–Y.

As noted by the board, the crux of the common invention of the parties lies in the matrixing. Both parties are con-

2. The brief for Pritchard reveals that I and Q modulation is conventional under standards adopted by the Federal Communications Commission on December 17, 1953. That system is described as offering technical advantages which happily need not be discussed here.

3. Richman obtains I and Q signals corresponding to those used in modulating the subcarrier. Pritchard derives signals which are in different phase positions 50.6 degrees apart and which he designates X and Z signals.

cerned with simplification of circuitry for producing red, blue and green color difference signals from two demodulated color difference signals of different phase position than the red, blue and green signals. Both parties disclose a circuit including three electron tubes of the triode type with a common resistor in the circuit from cathode to ground with each of the two demodulated signals impressed on the control electrode of one of the two triodes and with the control electrode of the third triode connected directly to ground. The outputs taken from the anodes of the three triodes represent the red, blue and green color difference signals respectively. Those output signals are obtained through intermixing the two input signals in three different ways as a result of their each contributing to the voltage drop across the cathode resistor common to all three cathode circuits. The effect is that of vectorially adding the two input signals in the proper polarities and magnitudes to provide the red, blue and green color difference signals. Correct proportioning is achieved through selection of the relative impedances in the circuits of the triodes. Although the Pritchard and Richman circuits operate on the same principle, they differ in detail due to the difference in phasing of the input signals.

Both parties took testimony. That for Pritchard relates to activities during 1952 and 1953 which he relies on as establishing completion of the invention prior to Richman's filing date as to all counts except count 3. The testimony taken by Richman is not directed to proving a date of invention prior to his filing date but instead relates to matters pertaining to Pritchard's case, including particularly the operation of the circuitry involved in the activities on which Pritchard relies.

The board held that Pritchard failed to prove completion of the invention of counts 1, 2, 4, 5 and 6 prior to Richman's filing date. It also ruled adversely to Pritchard on a contention, previously raised by motion to dissolve before the examiner, that Richman has no right to make counts 1, 2, 3, 4 and 5. The board noted that the term "cross-talk" is used frequently in the record and discussed that effect, also referred to as cross-coupling and cross-feed, as follows:

It refers to the appearance in a communication channel of a signal from another channel. Contamination of the signals in channels from those in adjacent channels may occur in many ways, and is of frequent occurrence in channels employing amplifiers having a common power source, or other common elements. It is undesirable, ordinarily, and is suppressed as much as possible but often small amounts are tolerated rather than to face the cost of complete separation of the channels. In the disclosed devices of the parties under discussion the cross talk is deliberate, calculated, and produces the results sought to be obtained.

Though the cross coupling of the amplifiers is the central idea, and the common cathode resistor is the only actual means shown by Pritchard to accomplish it, the counts vary considerably in language and counts 1 to 6 are interpreted and discussed individually by each party. * * *

It was also observed by the board that none of the circuits relied on by Pritchard to show completion of the invention involve the circuit which illustrates the invention in the Pritchard patent. In concluding that Pritchard has neither proven a reduction to practice nor established conception of any species of the invention in issue prior to the filing date of Richman, the board stated:

The difficulty that the party Pritchard is in is that, lack of corroboration apart, there is nothing in the circuit diagrams, nor other papers, nor even in Pritchard's testimony to show that he had in mind at any time during the period covered by the testimony the achievement of the matrixing in the amplifier tubes by cross coupling through a common cathode bias or any other impedance common to the input (cathode to control electrode) circuit.

The circuits relied upon apparently matrix and are intended to matrix in the output circuits. While there are cross connections between cathodes or points on the main cathode to ground connections which lead to ground through other impedances which undoubtedly gives rise to some cross-talk, these connections are apparently for some other purpose. There is no evidence of demonstration of the actual amount of cross-talk or to what extent it entered into the matrixing, if it did. There is no contemporary statement by the inventor or any one else as to what their opinion was as to the amount and effect of the cross-talk in these receivers. Reduction to practice is not accomplished by the operation of a device which, by rationalization after the fact, embodied relationships set out in the count but in unascertained and unrecognized degree and as a mere incident to other constructional and functional purposes. While it is true that reduction to practice may be proved by a species of the invention not disclosed in the involved application it must be clearly apparent that it is in fact a species of the *same* invention as is disclosed in that application, and the demonstration thereof must respond to the same criteria of reduction to practice.

Finally, the only species of the invention that we find that Pritchard discloses is that in his patent application, and in his Patent Disclosure Data Sheet (Exhibit 67), dated April 19, 1954, which states that the invention was conceived and the device was constructed and tested on March 19, 1954, long after Richman's filing date. Pritchard has introduced no testimony showing that he conceived this at an earlier date. It must be presumed therefore that he made the invention disclosed in his patent application subsequent to Richman's filing date.

While conceding that the circuitry illustrated in his patent fosters cross-talk to provide matrixing, Pritchard urges that no cross-talk relationships are required by the counts. It is his contention that the circuitry involved in four receivers he relied on for reduction to practice, identified in the testimony as rack receiver No. 1, rack receiver No. 2, a modified cabinet receiver No. 2B, and cabinet receiver No. 3, complies with counts 1, 2, 4, 5 and 6 even though he does not contend that such circuitry fosters rather than minimizes cross-talk.

Richman, in his brief, analyzes each of counts 1, 2, 4, 5 and 6 in detail to show that they do require relationships which result in the matrixing being attained by means of substantial cross-coupling through a common cathode impedance as held by the board. Using count 1 as an example, Richman states that the "mutual impedance" is required to be functionally mutual to the "transmission networks" to "cause" a signal developed in one network to "drive" each of the other networks to "produce" signal addition at the output terminals. To drive, he urges, means the same thing here as the production of useful cross-talk.[4] Richman also takes the position that the recitation in count 1 that there is "signal addition" of the input signals "at the output terminals" constitutes a requirement that the output signals ("corresponding to a second group of * * * phases") be of a different phase than the input signals ("corresponding to a first group of * * * phases").

Although counts 2, 4, 5 and 6 differ from count 1 and from one another in terminology and breadth at certain points, Richman takes the position that each of them likewise requires that cross-talk or coupling between the cir-

---

4. In support of that view, Richman cites the definition for "drive" given by Pritchard in his testimony as follows:

 XQ 47. Would you answer the question and then explain what your interpretation of "drive" is. A. * * *

My definition of the word "drive" is a signal which is impressed upon the control element of a vacuum tube and causes that tube *and is the main cause* of that tube to operate and produce output signals. [Emphasis Richman's.]

cuit elements receiving the input signals constitute the basis for the matrixing.

We are convinced from the record that Richman is correct in his position with regard to the requirement for cross-talk in counts 1, 2, 4, 5 and 6. As to count 1, the relationships specified therein, including the requirement that the "mutual impedance" cause signals developed in one "transmission network" to drive each of the other networks to produce signal addition of the impressed signals at the output terminals to provide the second plurality of signals, amounts to a requirement for circuit relationships utilizing cross-talk resulting from that impedance to provide the matrixing function. Counts 2, 4, 5, and 6 recite corresponding elements in different terms but in our opinion require the same relationship.

Our view here finds support in the emphasis which Pritchard gave to cross-talk, which he designated feature B, in arguing before the examiner that Richman has no right to make counts 1 through 5 and other counts since dissolved from the interference. Discussing former counts 11 and 12, which he took as first examples, Pritchard there urged:

> By virtue of the common cathode terminal connections shown by Pritchard, complete crosstalk between the amplifying tubes is maximized, in contrast with many prior art matrixing approaches where crosstalk is sought to be eliminated or minimized. * * *

He then stated further:

> In counts 1, 2, 4 and 5, the subject feature B is admittedly less clearly set forth. In these counts, the limitations of interest re the present point are the following:
>
> Count 1: "a mutual impedance coupled to the first control electrode of each of said transmission networks to cause any signal developed in one transmission network to drive each of the other transmission networks";

> Count 2: "a plurality of amplifiers having a mutual cathode resistor";
>
> Count 4: "a cathode resistor coupled from the cathodes of said first and second electron tubes to said fixed potential means";
>
> Count 5: "a common output load operatively connected therewith to each cathode to produce a signal combination of signals applied to the input terminals of said first and second amplifiers."

We thus think it clear that counts 1, 2, 4, 5 and 6 require relationships not provided by matrixing circuitry which minimizes cross-talk. Moreover, that same conclusion would be required even were the counts to be regarded as ambiguous, as Pritchard apparently suggests they might be. In the case of ambiguity of a count copied from a patent, resort must be had to the patent in which the count originated. Smith v. Wehn, 318 F.2d 325, 50 CCPA 1544; Chedaker v. Lo, 318 F.2d 333, 50 CCPA 1556. Consideration of the counts in light of the Pritchard patent demonstrates even more emphatically that the relationships of the "mutual impedance" in the "transmission networks" discussed above with respect to count 1, and the corresponding relationships inherent in counts 2, 4, 5 and 6, require that substantial cross-talk be provided through the medium of that impedance to cause the matrixing.

The briefs for both parties analyze at length the circuitry embodied in the receivers relied on by Pritchard as showing completion of the invention. They also discuss fully the extensive testimony concerning the operation of that circuitry by Pritchard and by Richman's witness Loughlin, both highly qualified experts in the color television field.

Although Richman advances additional specific reasons why he regards the circuitry in those receivers as failing to comply with the requirements of counts

1, 2, 4, 5 and 6,[5] the issue is readily resolved by consideration of the question of cross-talk. Thus, Pritchard does not demonstrate that the circuits, which are decidedly different from those in the involved cases, utilized substantial cross-talk to provide the matrixing. On the contrary, he concedes that "crosstalk between the channels which were interconnected for matrixing purposes [in the receivers relied on] was viewed as undesirable" and that he "chose the circuit values so as to keep the crosstalk inherently introduced by these interconnections to an acceptably low figure." The evidence in the record, including the testimony of Pritchard himself on cross-examination, satisfies us that cross-talk in the receiver's matrixing circuits was actually kept to a minimum amount, unperceptible to an ordinary viewer. Moreover, there is nothing in the record which shows even conception of a circuit providing the required relationships prior to Pritchard's filing date. As observed by the board, Pritchard's first record showing of that subject matter is his disclosure to the RCA patent department, which is dated April 19, 1954 and sets out March 19, 1954 as the date of conception and testing.

Pritchard charges that the board was inconsistent in holding that his receivers do not comply with counts 1, 2, 4, 5 and 6 while not finding error in the examiner's determination that the Richman application supports counts 1, 2, 4 and 5. We see no such inconsistency.

In the first place, the Pritchard receiver circuits differ in content and mode of operation from that of Pritchard's patent and do not comply with the counts for reasons already discussed. Also, Richman's circuitry is vastly different from the Pritchard receiver circuits while closely resembling that of Pritchard's patent, and we, like the board, see no error in the examiner's ruling that it does comply with counts 1, 2, 4

and 5. That circuitry includes a common impedance connected in the cathode to ground circuits of each of three amplifier tubes. Color difference signals I and Q, demodulated from the received signal, are impressed on the respective control grids of two of the tubes to provide cross-coupling which results in combination of the signals in such manner as to provide red, blue and green color difference signals at the respective outputs of the tubes. It is further apparent from the record that the Richman device operates on the same principle as that of the Pritchard patent. While we recognize that there is a specific difference between the two, nothing that has been advanced here satisfies us that there are any limitations in counts 1, 2, 4 and 5 which are not supported by Richman.

As to count 3, for which he relies only on his record date, Pritchard makes a direct and vigorous attack on Richman's right to make. That count, reproduced hereinabove, differs from the others in not specifying the "mutual impedance" of count 1 or reciting that element in the different terminology of the other counts. Instead, it states that "a trio of electron stream devices" are

* * * coupled to cause modulation introduced in one electron stream to provide corresponding modulations in the other electron stream devices.

According to Pritchard, the pivotal term in count 3 is "corresponding modulations" because "these words not only characterize the manner in which the trio of 'electron stream devices' (tubes) are interconnected but, also, define the basis for the 'signal addition.'" He urges that "corresponding modulations" is ambiguous and that reference to his patent demonstrates that it means that the modulations have the same amplitude. His reasoning is:

The variables (of the signal modulations) with which a color matrix is directly concerned are (1) amplitude

and (2) polarity. And, in defining how the devices are coupled to perform a matrix action on color signals, count 3 relies upon the *"corresponding modulations"* clause. Thus, when the count speaks of producing *"corresponding modulations"* in the intercoupled devices, appellants submit that ambiguity is present, since, in context, several connotations are possible: (a) the modulations so produced are the same in amplitude as those which cause them, or (b) they are the same in polarity, or (c) they are the same in both amplitude and polarity.

Now in the case of Pritchard's patent circuit, the produced modulations are *not* the same in polarity as those which cause them (by reason of the difference between grid-drive and cathode-drive), *but they are the same in amplitude.* Connotations (b) and (c) are thus seen as improper ones, when, as required, the ambiguity is resolved in the light of the originating patent disclosure.

Accordingly, we submit that, correctly construed, count 3 is not supported by the Richman application, for the modulations produced in his circuits are *not the same* in amplitude as those which cause them.

On that point the board stated:

The Primary Examiner held, in his decision on motions to dissolve, that the word *corresponding* was not ambiguous, but merely broad. We agree with this holding. A modulation being carried through a system varies in amplitude and phase relative to the starting point but can be recognized and identified with what it was (until it is drowned in noise) and can be properly said to correspond. If correspondence as to some particular characteristic is requisite to define an invention, such point or points of correspondence should be specifically recited in the claim.

We find no error in the finding that Richman can make count 3. It is true that the color difference signals X and Z which Pritchard applies to the trio of matrixing tubes are derived at a different phase relation that the I and Q signals employed by Richman and it appears that that difference may be at least a contributing cause for the equality in amplitude argued by Pritchard. Such equality is lacking in Richman's circuit wherein two of the "electron stream devices" have an additional resistor connected between the cathode and the mutual impedance. However, as further noted by the board, "the principle of operation [of the Pritchard and Richman circuits] is electrically and mathematically the same." The produced modulations in Richman obviously are related to the introduced modulations providing them. Thus the issue involves simply the scope in which count 3 defines the invention. In effect, Pritchard is asking that the term "corresponding modulations" be construed as requiring "modulations" which are not only "corresponding" but also are *equal in amplitude.* We consider such a construction unwarranted.

In summary, the appellant Pritchard has failed to show any reversible error in the board's decision. The activities relied on for completion of the invention of counts 1, 2, 4, 5 and 6 do not involve the invention defined in those counts and, in fact, the record fails to demonstrate that Pritchard even conceived the invention prior to Richman's filing date. Also, the board did not err in agreeing with the examiner that Richman's application supports count 3, as well as counts 1, 2, 4 and 5.

The decision is affirmed.

Affirmed.