Richard G. **RION** et al., Appellants,

v.

Alfred S. **AULT** et al., Appellees.

Patent Appeal No. 8591.

United States Court of Customs
and Patent Appeals.

Aug. 23, 1973.

Rehearing Denied Oct. 25, 1973.

Milton L. Simmons, Cleveland, Ohio, attorney of record, for appellants.

Otto R. Krause, Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., attorneys of record, for appellees.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

## ON REHEARING

RICH, Judge.

Our original opinion of February 24, 1972, was published at 455 F.2d 570. We there reversed the decision of the Board of Patent Interferences awarding priority to Ault et al. (Ault) and remanded because we found "there is no interference in fact." Ault petitioned for rehearing and Rion et al. (Rion) opposed. The Patent Office Solicitor called our attention to the fact that under the Patent Office Rules a holding of no interference in fact is not appropriate under the facts of this case and that the case of Brailsford v. Lavet, 50 CCPA 1367, 318 F.2d 942 (1963), which we had cited in support of the contrary proposition, was distinguishable on its facts. We now agree with this Patent Office position. We granted rehearing on November 9, 1972, and the case was rebriefed at our request and reargued on February 5, 1973.

We have fully reconsidered the case, concluding that the reasoning of and result reached in our prior opinion was erroneous. Our opinion of February 24, 1972, is hereby withdrawn and replaced by the following opinion. The decision announced therein is vacated.

---

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention to Ault, the senior party, on the ground that Rion's evidence failed to establish either a conception or reduction to practice prior to Ault's filing date. The board also held, contrary to Rion's contentions, that Ault had the right to make the counts and, in connection with this holding, ruled that the definition placed on the counts by the Primary Examiner, who drafted them and suggested them to both parties, is controlling.

This appeal by Rion does not question the board's holding that Rion did not overcome Ault's record date and, therefore, so far as priority in time is concerned, Ault must be accepted as the first inventor of whatever he invented. This appeal, as briefed and argued by Rion, essentially raises only the question of Ault's right to make the counts. Ault, on the other hand, has raised a question as to whether the issue raised by Rion is ancillary to priority and whether we have jurisdiction to consider it. Ault does not see the issue as one of Ault's right to make the counts but rather as a question of the definiteness of the counts which, he argues, is a question not ancillary to priority. Neither question can be intelligibly discussed without knowledge of the inventions of the parties and the counts on the basis of which the interference has proceeded.

### Background of the Inventions

In the making of enameled sanitary ware such as bathtubs, basins, sinks, and the like, a coating of porcelain enamel is formed on a cast iron base. The enamel is formed by melting on the surface of the article a particulate material called "frit," which is a special kind of glass composition. The white color in the enamel has long been produced by the use of antimony in one form or another as a frit ingredient. Rion calls this kind of opacification the "insoluble particle" method. It was appreciated that titania (titanium dioxide) would be a better and cheaper opacifier if it could be made to produce a uniform enamel but attempts to use it in the dry enameling process resulted in a mottled appearance. Rion and Ault both discovered that mottling could be eliminated by subjecting the titania-containing frit, before use, to a heat treatment to produce nucleation of the dissolved titania in the frit, the result being a more uniform crystallization of the titania in the enamel coating when it was formed on a hot iron surface.

Frit is produced by mixing the ingredients and melting them at a temperature of the order of 2000° F. or more to form a glass. The molten glass is con-

verted to frit by, for example, pouring it between cooling rolls which form it into a ribbon which is quenched and broken up into particles which may be ground to the desired size. The nucleation heat treatment may take place while the frit is in its initial particulate form.

### Rion's Disclosure

Rion's application, serial No. 252,622, filed January 21, 1963, contains a "flow diagram," the steps of which are, in order, as follows, quoting Rion's words:

Admixture of materials capable of fusing to a vitrified composition, said materials containing a soluble particle opacifier

Fuse materials to a fused mass

Quench said fused mass to the fritted state

Adjust temperature of frit to between 600° F. and 1300° F., below fusion point of said frit

Cool said frit below 600° F.

Apply frit to workpiece and fuse thereon.

With respect to the last step, the practice is to heat the workpiece, such as an iron bathtub or basin, to 1400°–1800° F. in a furnace from which it is withdrawn and coated with frit which is sprinkled onto the hot surface and fuses thereon to form a film. The workpiece is then returned to the furnace to complete the fusion process. This coating process may be repeated until the desired thickness of enamel is produced, after which the workpiece is cooled.

Rion's application sums up his invention in a single paragraph as follows:

Briefly stated, our invention consists essentially of a method of producing a vitreous composition containing a soluble particle opacifier and adaptable to be used as a protective coating, comprising the steps of melting intimately mixed raw batch materials into a fused mass, quenching said fused mass to the fritted state, adjusting the temperature of said fritted vitreous composition to between about 600° F. and 1300° F., but below the fusion point of said frit, for a time sufficient to precipitate a quantity of the contained soluble particle opacifier, and cooling said fritted vitreous composition to a temperature below said previously adjusted temperature. Applying said fritted composition to a workpiece and fusing said fritted composition thereon provides a vitreous coating therefor of superior appearance and durability. Our invention further consists in the novel fritted composition obtained by said method.

Rion's specification contains a number of definitions of the terms employed, among which are the following:

3. NUCLEATION TEMPERATURE: * * * shall mean the critical temperature, below the fusion point[,] to which a vitreous composition is adjusted following quenching, at which substantial incipient precipitation of soluble particles from solution in the glass matrix, occurs * * *.

* * * * * *

6. FUSED MASS: Throughout the specification and claims, the term "fused mass" shall refer to a vitreous composition in its melted state.

* * * * * *

9. QUENCH: As used in relation to "frit", the word "quench" shall mean any relatively sudden cooling of a vitreous composition from its fused mass state, through its freezing point to solidification, whether by sudden immersion in water, sudden contact with cooling surfaces, or air, as opposed to the term "annealing" as used in the plate and container glass industries, to denote relatively slow and gradual cooling of a vitreous composition from its melted state to relieve internal stresses.

It is of significance in this case that Rion does not define the term "fusion point." As will appear, this whole case revolves about this definitional void and confusion as to the meaning of "fusion."

The Rion application in interference is stated to be a continuation-in-part of application serial No. 127,472, filed July 28, 1961, and abandoned shortly after the instant application was filed. In that parent application Rion, in summarizing the essence of the invention, described the reheating or nucleation step thus:

* * * reheating said frit to a temperature greater than the temperature to which it was previously cooled, but less than the melting point of said frit.

In rejecting his claims, the examiner said, inter alia,

The reheating step is the critical feature of the invention. * * * It is noted * * * that the reheating step must be to a temperature less than the melting point of the frit. This feature should be included in all the claims calling for this reheating step. Reheating above the melting point will not give any beneficial results.

Rion acceded to this requirement by amending claims to insert the phrase "but below the fusion point of said frit," or equivalent phrases, except in one claim where he used the expression "but below the fusion temperature." In his accompanying "Remarks" he said:

All claims are now limited to reheating and nucleation below the fusion point of the frit in accordance with Examiner's suggestion * * *.

In the final rejection the examiner pointed out that Rion had overlooked amending some claims, saying:

Claims 1 and 2 are also too broad in that the reheating step should be down to a temperature less than the fusion point of the frit, as was indicated in the last Office Action. Applicant again indicated that all the claims were amended in this respect but claims 1 and 2 were not changed.

Apparently Rion did not further amend but two months later filed his continuation-in-part application instead. When the interference was instituted on the basis of counts drafted by the examiner, Rion's allowed claims were limited to heat treatment at a temperature "below the fusion point of said frit" except for claim 18 which said "lower than the fusion temperature of said frit." There is nothing in the prosecution of record to indicate that "fusion point" and "fusion temperature" were in any way distinguishable.

### Ault's Disclosure

Ault filed application serial No. 86,570 on February 2, 1961, nearly six months before Rion filed his parent application. It is entitled "Method of Preparing Porcelain Enamel Frit for Dry Process Enameling" and is directed, like the Rion application, to the seeding or nucleation of titanium dioxide crystals by heat treating the frit. The essence of his relatively short specification is found in the following extracts:

The range of heat treating temperatures extends from a temperature more than 100° F. above the softening point of the glass, but not more than 400° F. above the softening point of the glass as measured by an interferometer.

* * * * * *

The glass particles resulting from the quenching are then heated to a temperature at which nucleation of titanium dioxide exists. Nucleation occurs when a number of atoms present in a disordered state, aggregate to form centers of crystallization. * * * The temperature of nucleation is usually about 250° F. below the point where crystallization can take place. The minimum temperature for heat treatment is well above the softening point for the glass, and is usually at least 140° above the softening point as determined by an interferometer. The maximum temperature is, as stated previously, about 400° F. above the interferometer softening temperature. For best results, the temperature should be below the point where tackiness occurs in the glass.

For the titanium dioxide containing frit of the present invention, treatment time of one minute to twenty-five minutes is sufficient to achieve the desired nucleation. A time not in excess of fifteen minutes is definitely preferred.

Ault describes smelting the frit composition at 2500° F., quenching to break the glass up into particles, reheating to nucleate, and applying the frit to heated articles at temperatures from about 1400° to 1800° F. He says, "The frit is applied to the hot metal articles through a screen in the usual manner and fuses to a uniform enamel * * *." He gives an example of a particular frit which had an interferometer softening point of 959° F. and was heat treated at 1100° F. for 6 minutes, after which it was ground and sifted onto a hot cast iron surface heated to 1600–1700° F., producing a good enamel coating of uniform cast. He also gives an example of treating another frit composition with a softening point of 950° F. at 1000° F. for 6 minutes which did not produce the improved properties, concluding that 50° above the softening point is not hot enough.

## The Counts

On September 23, 1964, the examiner in charge of the Rion and Ault applications suggested two counts to each applicant and each made them without change. Count 1 is for the method of making a frit and count 2 is for the frit. Since the relevant language is the same in both counts, we reproduce only count 1:

1. The method of making an improved titania opacified porcelain enamel frit for dry process application which comprises fritting a molten silicate glass composition containing from about 8% to about 24% titanium dioxide by weight and thereafter heat treating the fritted particles at a temperature *sufficiently above the frit softening point*, but below its fusion point, for a time period sufficient to cause nucleation of at least some of the titanium dioxide therein. [Our emphasis.]

## The Rion Motions to Dissolve

Rion brought three motions to dissolve on the grounds: (1) that the counts are vague and indefinite; (2) they are unpatentable over prior art; and (3) that Ault cannot make them. Ault opposed all motions and the examiner denied them all.

At that time Rion adopted a position to which he has adhered ever since as the foundation of all his arguments. It is that the terms "softening point" and "fusion point" mean exactly the same thing. It was the basis of all three motions, the basis in part of his appeal to the board, and the sole basis of his appeal here.

It should be apparent from what has been said that the term "softening point" in the counts was derived by the examiner from the Ault application wherein it is more specifically referred to as the interferometer softening point. The meaning of this term is not in dispute on this appeal. It should also be apparent that the examiner took the term "fusion point" from the Rion application in interference, and from its parent application into which it was injected by amendment when the examiner asked to have all claims limited to a maximum heat treatment temperature "less than the melting point of the frit," as disclosed.

In deciding the motions, the examiner said, "There is no question as to what is meant by 'fusion point'. The issue is whether it is also the softening point." The examiner held that Rion had not established the equivalency of "softening point" and "fusion point." His decision, on reconsideration by another examiner, was adhered to. Rion petitioned the Commissioner who found no abuse of discretion.

## The Board Decision

As we noted, the board found that Ault was the prior inventor of subject matter within the counts. On the issue

which is before us—Ault's right to make the counts—it held:

> The heat treatment of the counts defines a temperature range of the transition between a point where the glass begins to soften and where it becomes molten. This is the definition placed on the counts by the Primary Examiner who, in drafting said counts for interference purposes, set forth the bounds to which the priority proofs of the parties would be limited. Under the circumstances of this case, particularly in view of the fact that neither party sought to change or modify the language of the counts, the definition of the terms of the counts by the Primary Examiner is controlling notwithstanding any alleged inconsistency with the technical definitions of the softening point and fusion point not found within the disclosures of the applications involved. Since the counts, as drafted and defined by the Primary Examiner, are broad enough to include within their scope the invention disclosed by the Ault et al. application, Ault et al. have the right to make the counts.

## OPINION

### The Jurisdictional Question

 The first matter to be decided is Ault's contention that this court is without jurisdiction to hear the sole question presented. Ault bases his contention on his theory that the sole question presented by this appeal is indefiniteness of the counts and that indefiniteness is not a question ancillary to priority, citing, in support of the latter proposition, precedents in this court and an article by Kreek entitled "Ancillary and Non-Ancillary Matters in Patent Interferences," 36 JPOS 7 (1954). Conceding, arguendo at least, that indefiniteness is not ancillary, Ault's argument falls because the sole issue on appeal is not indefiniteness of the counts. The issue on appeal is whether Ault can make the counts, a question which *is* ancillary to priority and over which we do have

jurisdiction. See Kreek, supra, and cases cited therein. We therefore proceed to consideration of Ault's right to make the counts.

### Ault Can Make the Counts

We preface our observations on this point by noting the fact that this is a priority proceeding, the sole purpose of which is to determine whether Rion or Ault was the first inventor of certain subject matter common to their two applications. Believing such common subject matter to exist, the examiner drafted counts intended to read on such common subject matter, as disclosed in each application.

 The question before us is whether the counts read on matter disclosed and claimed by Ault, not whether the counts are patentable to Ault. The examiner preliminarily decided, of course, that the subject matter of the counts was patentable to Ault before setting up the interference and adhered to that view in deciding the motions to dissolve. But that is not a conclusive determination; it is simply not a matter before us. See, for example, Patent Office Rules 258 and 259.

The burden of Rion's argument throughout the interference and certainly throughout his briefs in this court has been that "fusion point" in this art means precisely the same thing as "softening point" as determined by an interferometer. This contention is based on the testimony of an expert witness, Dr. Friedberg, and on a book by Dr. A. I. Andrews, another expert in the field. This evidence was before the examiner in affidavit form during the motion period and it was before the board, as it is before us, a part of the record in the interference. Both tribunals decided not to be bound by it in determining the meaning of "fusion point" *in this proceeding*, and we think correctly so.

 What we are concerned with is not the meaning of "fusion point" in the abstract or in its most technical sense but its meaning in this proceeding. If

Rion's evidence on the meaning of "fusion" conflicts with the ordinary dictionary definition of the term, which is the meaning obviously given to it by the examiner, then there is sufficient ambiguity to bring into play the rule, too well established to require citation of authority—but see Chedaker v. Lo, 50 CCPA 1556, 318 F.2d 333 (1963)—that we should interpret the term by reference to the application in which it originated. Considering that application and its history, it is clear to us that appellants themselves, and the examiners with whom they were in communication, took "fuse" and "fusion" in the ordinary dictionary sense of melting and equated melting point and fusion point. This definition, which we adopt, leads to meaningful counts, is reasonable in light of the Rion application prosecution history, and represents a justifiable effort to draw counts which define the interfering subject matter. Now, there may be some indefiniteness in the term "fusion *point*" because glass has no sharp melting point but just gets progressively softer with rise in temperature until it becomes fluid. In this case, however, certain things seem clear. One is that the final crystallization of the titania takes place while the frit is in a melted state on the workpiece and that both Rion and Ault wanted to conduct their nucleation or seeding heat treatment at lower temperatures. The disclosed firing or fusing temperatures on the workpiece are 1400°–1800° F. Rion's heat treating range is 600°–1300° F. Ault's is between 100° and 400° above the interferometer softening point, whatever that happens melting point and fusion point. This to be for a particular frit, examples being 1050° and 1100° F. Ault says "nucleation is usually about 250° F. below the point where crystallization can take place." In drafting the counts the examiner wanted to define a range which was inclusive of the subject matter

being claimed at the time by both parties and took the lower limit of "softening point" from Ault's disclosure and the upper limit of "fusion point" from Rion's claims. It is also clear that until the declaration of interference Rion made no attempt to give "fusion point" (or "fusion temperature" which, as we have pointed out, he also used in claims) any specific or technical meaning until he saw it to be to his advantage to try to avoid an award of priority to Ault.*

■ Our conclusion is that as the applications now stand they disclose common subject matter being claimed by both parties. Ault's heat treatment is between the softening point of the frit and the temperature at which it is fused or melted on the work. Rion's heat treatment, while it extends to lower temperatures, may also take place in this range, giving his words their ordinary meaning. No other meaning appears from the specification. The board was correct in holding that the meaning given to the counts by the examiner should govern. It was also correct in holding that the counts read on Ault's disclosed invention and that he can, therefore, make them.

### Costs

There remains the question of taxing the cost of printing two additions to the record requested by Ault. The first consists of about 247 pages of testimony by Ault's witnesses, predominantly on the issue of priority. Ault argues that Rion should pay for this addition in its entirety because the reasons of appeal indicated an appeal of the adverse determination of priority and, in the alternative, that Rion should at least pay for the printing of Van Dolah's testimony because Rion relied on it in his brief.

■ On the first point, Rion argues that Ault should have to pay for the printing of his own priority evidence because it was known in advance that Ault

---

* It may be that the counts have too low a lower limit in "softening point" from the standpoint of patentability to Ault since his disclosure appears to be limited to a lower limit 100° F. above softening point, but we are not passing on patentability. This is a matter for ex parte consideration. What we are passing on here is solely priority as to common subject matter.

955

would not have to rely on it because Rion did not include in the record, or in the praecipe therefor, any testimony on the question of "date" priority. On the second point, they argue that they "need not have relied on any of appellee's [Ault's] voluminous, and for the purposes of this appeal, useless, testimony, since the equivalency of fusion and softening point were well established by Drs. Andrews * * * and Friedberg."

 We agree with Rion on the first point but with Ault on the second. Therefore, Rion shall pay for printing Mr. Van Dolah's testimony, but Ault is to pay for the rest of the first addition.

The second addition consists of the file history of Rion's parent application, being about 73 pages. As is evident from this opinion, the contents of this file history are relevant here and were essential to the completion of Ault's argument. The cost of printing it is therefore assessed against Rion.

### Conclusion

Costs will be taxed as above indicated and the decision of the board awarding priority to Ault is affirmed.

Affirmed.