40 C.C.P.A.(Patents)

**GALLAGHER et al. v. SMITH.**

**Patent Appeals No. 5980.**

United States Court of Customs
and Patent Appeals.

June 24, 1953.

Rehearing Denied Sept. 28, 1953.

940

Brown, Jackson, Boettcher & Dienner, Chicago, Ill. (Cameron A. Whitsett and Arthur H. Boettcher, Chicago, Ill., of counsel), for appellants.

Raymond D. Smith, pro se.

Before O'CONNELL, JOHNSON, WORLEY, COLE, and JACKSON (retired), Judges.

COLE, Judge.

This is an appeal in a patent interference proceeding in which the junior party, the joint inventors Gallagher and Weber, seeks to establish that the Board of Interference Examiners erred in awarding priority of invention as to all counts in issue to the senior party and patentee, Raymond D. Smith.

Recital of events directly leading to the declaration of interference commences with the filing of the Smith application on June 20, 1945, for improvements in a "Demountable Time Switch Unit for Universal Use." Thereafter, on January 26, 1946, the appellants filed a patent application for improvements in an "Automatic Timing Mechanism." During the pendency of the respective applications, the party Smith, by amendment dated August 17, 1948, added the claims involved in this interference to his application. On May 23, 1950, Patent No. 2,508,896, inclusive of the issue claims, was granted to Smith and several months thereafter the appellants copied said issue claims for purposes of interference.

That the counts read on both devices is undisputed. The question for determination here concerns priority of invention. To prevail, the junior party must establish his case by a preponderance of evidence.

Five counts are involved, the first of which is considered illustrative, and reads as follows:

"1. In a combined clock and time switch unit completely settable by the use of a single hand of the operator to perform at least two automatic switch actions at selected different times of day, the combination of, a framework, a circuitous scale of time-of-day markings stationed in relation to said framework, a first arcuate signal chart mounted for rotary adjustive movement relatively to said framework through a range of various settings in visible time signalling relation to said scale, a second arcuate signal chart mounted concentrically with said first chart for rotary adjustive movement through a range of various settings relatively to both said first chart and said framework in cooperative time-signalling register therewith, switch action controlling elements operably connected to said charts respectively in a manner to be stationed variously in different switch timing positions with respect to each other and to said framework in accordance with rotary settings of said charts, separate manuals connected to adjust said charts selectively to their said settings, and a brake arranged cooperatively with at least one of said charts and its

941

said manual in a manner to anchor the same yieldably in relation to said frame with sufficient force to hold said one of said charts and its said connected switch controlling element motionless during rotary adjustive movement of the other said chart within its said range."

It is pertinent to note that Gallagher and Weber (hereinafter referred to as appellant) are co-employees of the International Register Company, a manufacturer of mechanisms incorporating clockwork. This company occupies the somewhat unique position of being assignee of appellant's application as well as licensee of certain previously issued Smith patents relating to the latter's early work in the art (Patent Nos. 2,004,137 and 2,032,774) and also licensee of patent 2,508,896 which embodies the counts of this interference and is the patent here in dispute.

The invention in issue is adequately described by the Board of Interference Examiners in its opinion as follows:

" * * * The devices shown and described in the specification of both parties are time switches, to close and to open an electric circuit at predetermined times of day, the setting of the times of actuation of the switch being indicated on or in connection with a clock face. The devices have in common the provision of two concentrically mounted disc elements cut away in such manner that parts of both may be observed through, or around the clock face. The position of one of these elements serves to determine the time at which the switch closes, and the other the time at which the switch opens. Each of these elements is provided on a periphery, or on an element operatively engaging its periphery, with gear teeth which engage a spur gear on a shaft which projects to the outside of the housing where it is provided with a knob for manual adjustment. Each of the spur gear shafts is provided with a friction device to hold the same against accidental movement, as by being dragged by friction between the disc elements when one of them is shifted in its position. The devices of the two parties differ quite considerably in the mechanism for accomplishing the switching function, but this portion of the counts is broadly phrased and there is no contention as to either of the disclosures that it does not support the counts.

"It is necessary to notice, however, that the Smith device involves a wiping contact carried by a member which is driven by the time train and is concentric with the hour shaft, the wiper bearing upon two interleaved discs, one of metal and the other of insulation material. The make and break of the circuit is accomplished by the wiper dropping off the edge of the radial slit in one disc onto the other disc, which is interleaved with it. The edges of these discs that show on the face of the instrument provides indication of the point at which the switching operation takes place. Smith provides one of the discs with a different color than the other disc. The bands of color showing through a circular opening in the clock face give an easily apprehended indication of the time for the switch operations to occur and the length of interval between them. The nature of the continuously sliding contact of the Smith device is such that if the discs are turned in a direction counter-clockwise, the wiper will catch under projections on the discs which are provided for the purpose of giving the desired "snap" action, and damage that element. To avoid this, Smith provides the spur gear with a ratchet like arrangement consisting of holes in the web of the spur gears and a spring finger which drops into the holes from a lateral direction.

"We notice that the counts are specific with respect to the elements which have an indicating-time determining function and to the "manuals" which are used to set them, but are very broad and general as to the remainder of the combination which is required to make a complete time switch. * * *"

The presence of the friction brake mechanism in the combination furnishes the significant feature of the involved invention as one of Smith's early patents, i.e., No. 2,004,137, issued June 11, 1935, contains all elements of the instant invention with the exception of said friction brake recited in the counts of the present interference.

.In considering the relative positions of the parties with regard to the claimed invention, it is well to bear in mind the two principal contentions advanced by the appellant in challenging the conclusions reached by the Board of Interference Examiners in awarding priority to the party Smith. First, the appellant urges that the board was in error in ruling that Smith established a reduction to practice in 1938, and secondly the appellant contends that the board erred in construing the law applicable to an extended delay between the date of an alleged reduction to practice of the invention and the filing date of the patent application therefor. In this latter respect, the appellant argues that the evidence of record herein is clearly persuasive of the view that Smith either abandoned his alleged invention, concealed and suppressed the same, or otherwise forfeited any right he may have had to the award of priority.

The record discloses that Smith personally constructed Model 1 of his device in 1932 at the H. C. Thompson Clock Company. That such model evidenced conception of the instant invention is not disputed by appellant. In the same year, Smith prepared certain drawings of the invention (Smith Exhibit 12) as well as a written detailed description, both of which were, without substantial change, incorporated into Smith's patent application filed in 1945. At this juncture of the factual situation, the appellant points significantly to the failure of Smith to file a patent application at that time when, according to Smith's own testimony, he had an operative model of his invention. Smith emphatically denied, however, that any patent claims had been drawn at this time. In any event, Smith endeavored to solicit the interest of the H. C. Thompson Clock Company, as well as other manufacturers, in the production of his device, as represented by Model 1. While there appears to have been some interest on the part of said manufacturers between 1933 and 1935, the alleged invention of Model 1 was apparently not acceptable for commercial production due primarily to the existence of certain patents issued to the inventor

Warren relating to electric motors in electric clocks, which patents were not available for license, and due to the further fact that certain refinements appeared to be necessary in order to reasonably perfect the invention for practical manufacture. At any rate, Smith's efforts were of no avail until the year 1935 when the Ingersoll-Waterbury Company (hereinafter referred to as Ingersoll) became interested in the Smith device. Smith's Exhibit 41, showing a date of June, 1936, indicates that Ingersoll received from Smith a written description of the invention in specification form, patent drawings, and several models for inspection and testing. Again, it is noteworthy that the description of the invention contained in Exhibit 41, as well as the drawings accompanying the same, appear without substantial change in the Smith patent application filed in 1945. Smith again denies that any claims were in existence covering the invention at this time.

In correspondence, Smith repeatedly refers to his device, Model 1, as the "Color Band" time switch, presumably because of the contrasting color feature of the clock face. In this respect, it is essential to note that in 1930 and 1931, prior to the construction of Model 1, Smith had filed two patent applications relating to time switches of the "Color Band" type which subsequently issued in 1935 and 1936 as patents 2,004,137 (previously identified) and 2,032,774. Each of these patented disclosures was a forerunner of the device embodied in the counts of the present interference and, as will more fully appear during the course of this opinion, Smith was equally intent upon interesting manufacturers in these patents as he was in promoting the instant device.

Returning now to Smith's activities with Ingersoll, the evidence shows that the interest manifested by that company was continuous from 1935 to 1938, and that in 1937 a second model of the Smith device, Model 2, was constructed using Model 1 as a guide. This second model was built by Ingersoll in substantial accordance with Model 1, though a less expensive friction brake was incorporated in the second model. No affirmative steps were ever taken by

Ingersoll to actually manufacture the device, though there is evidence in the record to the effect that Ingersoll was satisfied that the model operated successfully. Ingersoll finally declined to carry through with the project in 1938.

Thereafter, a period of illness (1938-1940) allegedly interrupted Smith's efforts to sell manufacturers on his new device. In this regard, the evidence is far from satisfactory in establishing the actual facts of Smith's extended disability, although Smith, in his testimony, stated that he underwent two major operations from 1938 to 1940. The exhibits in the record bearing on this period of incapacitation indicate, however, that Smith's total hospitalization lasted less than two weeks, and the bills for hospital and surgical services seem relatively slight considering the length of time Smith alleges to have been ill. Yet, it is not for us to resort to guesswork as to the nature of Smith's disability, it not being disclosed, nor to speculate on the bona fides of the allegation that Smith was, in fact, ill all during the period claimed. In the absence of more concrete evidence on the matter, which could have been supplied by diligent efforts of the appellant in the proceedings below, we do not choose to infer that Smith was other than disabled between 1938 and 1940.

On June 18, 1940, Smith wrote to the General Electric Company (with which company he had previous unsuccessful negotiations between 1932 and 1935 relative to the "Color Band" time switch) enclosing copies of Smith patents 2,004,137 and 2,032,774, but Smith was again unable to interest that company in his "Color Band" time switch patents. In his brief, Smith states that he sent a photostat of Model 2 along with the aforesaid patents, but the record fails wholly to establish that the photostat was, in fact, of Model 2, and certainly an examination thereof, no interior mechanism being shown, sheds no light on whether the brake mechanism was included in that photostat. In its opinion, the board made no reference to the foregoing letter of June 18, 1940, so that the period from the end of Smith's illness until

1943 is not accounted for in the board's decision.

In 1943, Smith again wrote General Electric with reference to possible infringement by that company of Smith patents 2,004,137 and 2,032,774. This letter appears in its entirety to relate to these patents without mention of the Smith device as represented by Models 1 or 2, which Smith held in his possession since 1938. General Electric denied the infringement charge. In early 1944, Smith again wrote General Electric at which time he stated that he was "proceeding to offer rights under a number of timing mechanism patents to such concerns as I think could best benefit from them." The Smith application involved in this interference had not, at that time, been filed, so that it would seem that Smith was not offering the instant device, or even mentioning the same, to General Electric in that letter. However, the close relationship between the previously issued Smith patents in question and the instant device is such that it may not be unreasonable to assume that Smith's efforts were directed to negotiations concerning both.

In the interim, the appellant had entered the field, commencing in 1943. The Board of Interference Examiners awarded conception and reduction to practice to the appellant in 1943, and the record fully supports the board's action in that respect.

Previously, the International Register Company (appellant's assignee) had been manufacturing a device known as Model T-2002, and Smith, in September of 1944, charged International with infringing Smith patents 2,004,137 and 2,032,774. This was denied by International, but some interest was shown by that company in acquiring the subject Smith patents. In the meantime, Smith had been in contact with the United States Time Corporation (hereinafter referred to as United), commencing in November, 1944, regarding rights to the "Color Band" time switch. Definite interest was displayed by this company in Smith patents 2,004,137 and 2,032,774, and arrangements for the rights to these patents were discussed. Smith, in his testimony, stated as follows:

"The letter of December 8 [1944] is by the president Mr. Lehmkuhl [of United] and makes me a proposition to pay a yearly minimum of $3,000 for exclusive patent rights to manufacture some improved version of Model 2. This, despite the fact that in succeeding years I had not been able to ascertain a preferred mode of embodying the invention for practical production purposes, stimulated me to file my patent application which eventuated in the patent involved in this Interference as it was the first proposition that I had received that looked like definite business, and I had the benefit of some helpful suggestions and criticism as to the construction of Models 1 and 2 during these negotiations."

The correspondence between Smith and United does not indicate that the brake mechanism in question was discussed by either party but it appears that both parties were interested in the Smith patents previously issued on the "Color Band" time switch. It does not appear that United was aware that Smith had advanced beyond that which he disclosed in his patents of record. United decided, however, in August of 1945 not to adopt rights under the subject Smith patents. Previously, in June, 1945, Smith had filed his patent application covering the brake mechanism in issue because, as Smith states, the negotiations between himself and United "looked like definite business." It might be added that, at this time, appellant had not filed application, though appellant's invention had been reduced to practice in late 1943.

In April, 1947, Smith resumed discussion with International relative to patents 2,-004,137 and 2,032,774 and his charge of International's infringement thereof. Further, Smith attempted to revive International's interest in buying rights under said patents. In the same year, International forwarded to Smith a sample of what International referred to as the Model 6000 range timer, the appellant's device in issue, so that Smith could inspect the same with regard to whether this product infringed the prior Smith patents. In 1948, Smith having inspected Model 6000, repeated his charge of infringement and also made reference to the fact that he had a patent application pending, i. e., that filed in 1945, which disclosed advanced embodiments of his prior timing mechanism patents. International again denied that its devices, including the Model 6000, infringed any Smith invention. As previously indicated, Smith, in 1948, amended his then pending patent application to include the counts of the present interference, and after issuance of the Smith patent involved herein, appellant, as aforesaid, copied these added claims for purposes of interference. It must also be noted that for a three year period, 1946 through 1948, International, appellant's assignee, had sold thousands of the Model 6000 range timer, but market activity thereafter was terminated. The aforementioned license agreement between Smith and International was negotiated in 1950, but such agreement has no significant bearing on the issues of this case.

In the proceedings below, Smith contended that he had successfully tested and operated Model 1 of his device in 1932, and that such activity established reduction to practice of the involved invention. The Board of Interference Examiners, however, was not convinced by the testimony of record offered on behalf of Smith that the brake mechanism was "installed and its function in the combination recognized and demonstrated" at that time, although the board was satisfied that the Smith device, as represented by either Model 1 or 2, did, in fact, embody the combination required by the counts, and that as presently constituted, either model would perform in the claimed manner. Smith's further allegation that Model 2 was also successfully reduced to practice met with approval in the board's opinion, the necessary corroboration being found in the testimony of the witness Wagner, a clock designer for Ingersoll. In this respect, the board said:

" * * * it was his [the witness Wagner] purpose according to his instructions to produce in the model, Exhibit 2, [model 2] a device which would function exactly in accordance with the model, Exhibit 1 [model 1]; that he tested both the model, Exhibit 1, and the model, Exhibit 2 with lights

as a load at various time settings, observing operation of the manual of setting, and the correctness of operation of both devices. Furthermore, he noted particularly the friction brake in the model, Exhibit 1 and its function, and put into his design for the Exhibit 2 model a different sort of friction brake, one that he could supply more cheaply. While this testimony does not indicate a specially devised test for the function of the friction brake part, this feature is elementary, we might almost say kindergarten, mechanics with which an experienced mechanic or machine designer would have no difficulty either in applying or observing its correct functioning. The witness Wagner puts this testing, according to his recollection, as having taken place prior to some time in 1938. We accept this testimony as proving reduction to practice of the counts in issue as prior to the last day of the calendar year 1938. * * *

\* \* \* \* \* \*

"* * * The device was observed to be operative to switch on and off a lamp, and it is plainly capable of handling any other light load such as a signal bell or relay. The functioning of the friction brake was observed and appreciated. The nature of the switching mechanism obviously limits the allowable load to a few amperes, but this does not render the device non-useful. The nature of the switching mechanism also imposes upon the setting mechanism the characteristic of substantially one-way setting movement, such as is the case in many alarm clock alarm sets. These latter features have played a part in failure to commercialize the device but it is not ordinarily essential that commercial production be proven in order to establish practical utility."

We have carefully considered the testimony of record and contentions of the appellant bearing on Smith's alleged reductions to practice, both in 1938 and prior thereto, and while we find the board in its opinion to have made several erroneous assumptions of fact relative to the testimony of the corroborating witness, Carl Wagner, we are in agreement with the ultimate conclusion expressed in the board's decision.

As a matter of law, we are unable to find on the instant record any corroborative evidence of reduction to practice by any witness testifying on behalf of Smith prior to the testimony of Wagner. With respect to the Wagner testimony, the board was mistaken in its impression that the evidence established that Wagner terminated his employment at Ingersoll in 1938, and that Wagner actually said, in response to questions from counsel, that he satisfactorily tested and operated the Smith models in 1938. It appears that the board's erroneous assumption concerning Wagner's employment may have prompted it to conclude that the witness, having left the employ of Ingersoll in 1938 (as it believed), and having testified that he tested the invention in question while in Ingersoll's employ, did, in fact, do so sometime prior to terminating that employment. The fact that Wagner continued in the employ of Ingersoll (and its successor) for a considerable period after 1938, and that he did not actually state a date or dates when he tested the Smith models is not regarded by us as being of serious consequence when considered in the light of that witness' surrounding testimony. While Wagner was not pointedly asked, either on direct or cross examination, the date of the testing, it is apparent to us that Wagner was speaking of events within his personal knowledge that occurred in 1938, and that had he been requested to affirmatively establish such a fact, would have so done.

We also note that Smith Exhibit 49, a properly authenticated letter from Ingersoll to Smith, indicates that Model 2 was running satisfactorily after testing and this letter is dated in 1937.

While we have given every consideration to appellant's contention that the tests in question amounted to nothing more than abandoned experiments, we find ourselves unwilling to adopt such a view, feeling as we do that Smith has properly proven a reduction to practice in 1938.

The principal argument presented by appellant relates to Smith's alleged delay and inactivity in the matter of filing his patent application after reduction to practice of

the invention had been achieved. Appellant's position is that the evidence of record conclusively supports a finding to the effect that Smith, having suppressed and concealed his invention from 1938 to 1945 (Smith's filing date), or having abandoned the invention until after the appellant's conception and reduction to practice in 1943, forfeited his right to the award of priority.

In approaching this issue, we wish to commend counsel for the respective parties on their thorough and concise briefing of the doctrine so emphatically embraced by the appellant herein. While we have not been without serious doubts as to its proper application under the facts of this case, we must conclude that the evidence offered by appellant is insufficient in law to warrant a reversal of the award of priority to Smith.

■ Although it is a well settled proposition that the law favors and seeks to reward the first inventor of a patentable device, it does not do so in blind disregard of a proper showing of acts detrimental to the purpose and spirit of such law which are sufficient to defeat that inventor's right to be adjudged as entitled to priority.

■ In the early case of Mason v. Hepburn, 13 App.D.C. 86, the doctrine of equitable estoppel based on supression and concealment of an invention following its reduction to practice was appropriately formulated. Numerous applications, as well as misapplications, of that doctrine have been set forth through the years, but it remains a fundamental principle that mere delay in filing will not suffice, in itself, to defeat the rights of the first inventor. A party seeking to succeed by invoking applicability of the doctrine must affirmatively establish that the elements of concealment and suppression are present in the facts of the particular case under consideration. Requisite proof is essential and it cannot be supplied by an improper over-indulgence in conclusions warped by undue presumptions and inferences.

In its simplest form, the question here may be presented as follows: What evidence of suppression, concealment (and/or abandonment) has the appellant placed before us to warrant a holding that Smith is now estopped from being adjudged, as a matter of fact and law, the first inventor and, as such, entitled to prevail?

In the first place, appellant directs attention to Smith's admission (against the interest of the party Smith) that a reduction to practice was established in 1932; that a patent application was at that time in existence, though no claims were then drawn; and that as the invention disclosed in Smith's application of 1945 is not patentably different from that which Smith possessed in 1932 or thereabout, the long delay in filing is inexcusable and amounts to concealment and suppression. Further, appellant suggests that the situation relative to the Warren patents, aforementioned, can have no bearing whatever on Smith's failure to submit his completed application. It is also suggested by appellant that Smith's allegation to the effect that he was endeavoring to solve practical difficulties in the operation of his device cannot be used as an affirmative defense for such long delay, especially when no such improvements are evidenced in the involved invention. Taking into account the admission against Smith's interest, the appellant thus concludes that Smith clearly suppressed and concealed his invention in a manner not sanctioned by law.

Considering the period from Smith's conception until 1938, the established date of reduction to practice, it is entirely clear that Smith was actively engaged in repeated attempts to persuade manufacturers to produce his device. Smith was not concealing or suppressing his alleged invention during this time but, on the contrary, was acclaiming the benefits thereof to those who he hoped would manufacture it. While Smith might have filed his application during the period presently being considered, the fact that he did not do so is not evidence in support of appellant's position. Whatever reason Smith may have had in mind for withholding his application on an invention which he deemed to be satisfactorily demonstrated, we do not know, and while we might speculate on the subject, it is not becoming to us to violate the prevailing body of law and conclude

that such delay, in and of itself, prevents Smith from being adjudged the first inventor in law.

With regard to Smith's conduct following actual reduction to practice in 1938, as awarded herein, we are not impressed with that inventor's allegation that, except for his period of disability, he was actively engaged in attemping to promote the instant invention. We are equally unimpressed with the allegation that Smith was doing all in his power to confer the benefits of his invention upon the public at large. It appears to us that Smith was practically effortless in this period insofar as a showing from the exhibits would indicate. Whatever influence the late war had upon Smith's failure to file a patent application on a completed invention, we can only guess, and while our unexpressed conclusions in this respect might not be justified, the fact remains that the law supports Smith's right to priority. Appellant has not proven by a preponderance of evidence that Smith concealed and suppressed the invention (nor abandoned the same, although we do not believe that appellant seriously contended the affirmative of such result), and we are manifestly unwilling, on the facts of this case, to allow ourselves to substitute what might, at first appraisal, be a clearly warranted presumption in place of the direct proof required by law. In summarizing, it is well to repeat that a showing of concealment or suppression is not made out by merely establishing the fact of an extended delay in applying for a patent upon an invention previously reduced to practice.

Smith has argued that the doctrine of equitable estoppel has no application until and unless there is evidence of the fact that the party alleged to have concealed or suppressed an invention was incited to activity as a result of being appraised that a rival had entered the field with respect to the same invention. This view was supported by the board in its decision. We are not necessarily in agreement with such reasoning. Such a condition is not an absolute prerequisite to proper application of the doctrine, though the existence of such a circumstance carries with it persuasive value. In a proper case, we would not hesitate to apply the doctrine where the proof indicates deliberate suppression and concealment without more. In the instant case, appellant fails to show that Smith was "spurred into activity" by knowledge of appellant's work. Such factor has been taken into consideration in our study of the case.

For the reasons hereinbefore indicated, the decision of the Board of Interference Examiners is affirmed.

Affirmed.

WORLEY, J., dissents.

JACKSON, J., retired, recalled to participate herein in place of GARRETT, C. J.