Samuel J. PINGREE and George A. Batman, Appellants,

v.

Henry E. HULL, Appellee.

Patent Appeal No. 74–623.

United States Court of Customs and Patent Appeals.

June 26, 1975.

John D. Pope III, St. Louis Mo., attorney of record, for appellants.

Roland H. Shubert, attorney of record, for appellee. Joseph A. Hill and Martin Avin, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MILLER, Judge.

The senior party, Pingree and Batman (Pingree),[1] appeals from the decision of the Patent and Trademark Office (PTO) Board of Patent Interferences awarding priority of the invention described in four counts to the junior party Hull.[2] We affirm.

The invention deals with adhesive removal of guard hairs from fur seal skins, leaving the fine fur fibers intact. The fine fur, which is covered and protected by the longer and coarser guard hairs, is the part of the skin prized by furriers and their customers. Count 1 describes the invention:

A process for removing guard hair from a fur seal skin without substantial removal of fur therefrom, said process comprising applying a gripping substance to the guard hair while avoiding substantial contact between the gripping substance and the fur, and parting the skin from the gripping substance, said substance, upon parting, pulling guard hairs out of the skin and leaving the fur on the skin.

Counts 2–4 add limitations immaterial to the issues before us.

Two issues are presented: first, whether Hull's application supports the counts; second, whether Pingree abandoned or suppressed the invention within the meaning of 35 U.S.C. § 102(g). During the motion period and at final hearing below, Pingree raised other issues that the board found against him. Although Pingree's reasons of appeal touch on these issues, he argues only the support and abandonment issues here and is deemed to have abandoned the unargued points. *In re Wiechert,* 370 F.2d 927, 936, 54 CCPA 957, 968 (1967).

The interference was declared after Hull copied, in modified form, claims 1–4 of the Pingree patent. Pingree moved to dissolve the interference on the ground that the Hull application had no support for the limitation "applying a gripping substance to the guard hair while avoiding substantial contact between the gripping substance and the fur." The motion was denied by the primary examiner. Thereafter the parties took testimony and filed briefs.

Pingree's preliminary statement alleged an earliest date of actual reduction to practice of February 6, 1957. Hull's corresponding alleged date was February 3, 1966. Before the board, Hull conceded that Pingree was first to reduce the invention to practice—as early as the date alleged in his preliminary statement. Hull's position was that, by waiting over ten years from the date of actual reduction to practice before filing an application, Pingree had abandoned the inven-

---

1. Involved on patent No. 3,435,641, issued April 1, 1969, on an application filed August 17, 1967, assigned to The Fouke Company.

2. Involved on application serial No. 687,510, filed December 4, 1967. The Hull invention resulted from work done under a contract with the Bureau of Commercial Fisheries, Department of the Interior, and title to any patent issued on the application would be in the United States of America.

tion and was therefore not entitled to an award of priority.

In awarding priority to Hull, the board found that Hull's application supported the counts:

As was pointed out in the decision of the Primary Examiner, the basic purpose of both parties is to remove the undesirable coarse guard hairs from the fur seal skin leaving the fine fur on the skin in an undamaged condition as removal of the fine fur hair or injury thereto would decrease the value of the finally processed fur skin. Substantial contact between the gripping substance and the fine fur hair would result in the removal of some of the fine fur when the gripping substance and its backing is separated from the skin, which would be contrary to the purpose of avoiding injury to the fine fur. We also note that original claim 1 of the Hull application is for "A method for selectively removing guard hairs from animal pelts." That this is done "selectively" agrees with the concept that the gripping substance is not in contact with the fine fur (avoiding substantial contact between the gripping substance and the fur) as fine fur is not removed with resultant injury to the quality of the finished skin.

The board agreed with Hull that Pingree had suppressed and abandoned the invention and awarded priority to Hull, notwithstanding Hull's concession that Pingree had actually reduced the invention to practice some nine years earlier. Pingree argued that the delay in filing was to await the results of testing a machine to practice the process. However, the board noted that many hundreds, possibly thousands, of fur seal skins were adhesively unhaired between February 6, 1957, and June 1961; that a disclosure dated November 14, 1961, containing drawings and descriptions that are essentially those in the Pingree application was supplied to a patent attorney on March 13, 1962; that the *machine* being tested was not the apparatus disclosed in the patent; that the counts are directed to a *process* carried out many times between December 1956 and June 1961; and that it was only after receiving information that an opponent had entered the field of adhesive unhairing that Pingree decided to file a patent application.

## OPINION

Relevant portions of Hull's disclosure relating to the important part of the disputed limitation, "while avoiding substantial contact between the gripping substance and the fur," read as follows:

Briefly, the present invention involves a process of *selectively* removing guard hairs from animal pelts containing both fine fur and coarse guard hairs by contacting the fur pelt with an adhesive coated substrate and then pulling it away. We have found that using this method of removal, guard hairs are extracted *without damage to the underlying fur fibers.*

. . . . .

Previous operations directed toward removal of guard hairs from pelts have been variously termed plucking, picking, clipping, shearing and unhairing. All have involved the use of machines designed to selectively extract the guard hairs or to cut them below the surface of the underlying fur. None have proven successful in avoiding injury to the underfur.

We have found that selective guard hair removal can be achieved by *pressure contacting* the pelt containing guard hairs with a substrate having an adhesive unhairing system. Using this technique *only the guard hairs are removed.*

. . . . .

Adhesives used in the present invention are the type generally known as packaging adhesives, that is, ones that produce moderate to high strength in shear, tension and peel. It is desirable that the adhesive used have a high degree of tackiness characteristic of

*pressure-sensitive adhesives.* Useful adhesives include not only water soluable [sic] forms but also hot-melt and solvent-dilutable compositions.

.    .    .    .    .

The above composition is merely an example of a polyvinyl acetate emulsion. We have found that similar emulsions not containing plasticizers or additives may also be used. The combination of substrate and adhesive should be one in which the adhesive is adhered to the substrate more strongly than to the guard hairs. This will avoid separation of adhesive from the substrate upon stripping of the pelt.

Guard hair removal is accomplished when a substrate coated with adhesive is pressed against the pelt and then pulled away.    .    .    . This action, well known to doctors and patients who have removed adhesive bandages, creates a pull on [the] guard hairs .    .    . causing their removal as they adhere to [the] surface .    .    . [of the substrate]. The result is the exposure of the fine fur.    .    .    .

.    .    .    .    .

The arrangement shown    .    .    . is merely one form of a continuous system. Other features may be incorporated into the system including .    .    . means to vary the pressure and time and angle of contact as well as the speed of the pelt    .    .    . or substrate.    .    .    .

### Example

An untreated fur seal pelt is pressed from 150–330 psi for a dwell time of 30 seconds against a tin panel coated 5–mil thick with polyvinyl acetate emulsion adhesive. The pelt is pulled away at a 10–12 inch per minute removal rate at an angle of 140–180°. Under these conditions, substantial guard hair removal is effected without damage to the fine underfur.

Though the invention has been described with reference to preferred embodiments, it will be appreciated that various adaptations and modifications will be within the spirit and scope of the invention as distinctly defined in the claims hereinbelow. For example, though such variables as contact time, pressure of contact and stripping speed are all important, these factors may vary according to the particular pelt undergoing treatment and the adhesive used. It is within the routine skill of an operator to quickly and easily optimize these variables in specific fur treatments. [Emphasis added.]

■ We agree with Pingree that Hull's disclosure contains no *explicit* requirement that substantial contact between the adhesive and the fine fur on the seal skin be avoided while practicing the process. The board opinions refer to no such express disclosure. Therefore, the disputed limitation must find *inherent* support in the quoted portions of Hull's application for the award of priority to Hull to be sustained. Hull has a twofold burden of proof on this point. As this court said in *Dreyfus* v. *Sternau,* 357 F.2d 411, 415, 53 CCPA 1050, 1054 (1966):

First, one copying a claim from a patent for the purpose of instituting interference proceedings must show that his application clearly supports the count. *Jepson* v. *Coleman,* 314 F.2d 533, 50 CCPA 1051 [(1963)]. There must be no doubt that an application discloses each and every material limitation of the claims and all doubts must be resolved against the copier. *Jepson* v. *Coleman, supra*; *Bierly* v. *Happoldt,* 201 F.2d 955, 40 CCPA 774 [(1953)]. Second, where support must be based on an inherent disclosure, it is not sufficient that a person following the disclosure might obtain the result set forth in the counts; it must inevitably happen. *Crome* v. *Morrogh,* 239 F.2d 390, 44 CCPA 704 [(1956)].

In *Hansgirg* v. *Kemmer,* 102 F.2d 212, 26 CCPA 937 (1939), the court said (emphasis in original):

> Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient. [Citations omitted.] If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient.

Since "substantial contact" is an ambiguous term, resort to Pingree's specification for its construction is proper. *Rion* v. *Ault,* 482 F.2d 948, 953–54, (Cust. & Pat.App. 1973). "Substantial contact" does not appear *in haec verba* therein, but it is clear that the purpose of the patented invention is to remove guard hair without damaging the underlying fur. The specification expresses the object of providing "a method for removing guard hair which does ont [sic] adversely affect or remove the fur." Count 1 itself recites the purpose of "removing guard hair from a fur seal skin without *substantial* removal of fur therefrom." (Emphasis added.) Pingree's own witness, Rosenbaum, testified that "substantial contact" would necessarily damage the fur; and appellant Batman similarly defined "substantial contact." Giving the count its broadest reasonable interpretation in light of the purpose of the invention, the words, "avoiding substantial contact," mean avoiding such contact as will damage the fur. If the contact is insufficient to cause damage to the fur, it is not "substantial." We agree with the board that "[s]ubstantial contact between the gripping substance and the fine fur hair would result in the removal of some of the fine fur when the gripping substance and its backing is separated from the skin, which would be contrary to the purpose of avoiding injury to the fine fur."

An applicant who uses broad language to claim his invention runs the risk that others might be able to support that language with a variation of his specific embodiment. *Hemstreet* v. *Rohland,* 433 F.2d 1403, 1406, 58 CCPA 743, 747 (1970). Although Pingree may disclose as one embodiment a flowable adhesive which flows only around that part of the guard hair located beyond the fur but not into the fur itself, the patent claims are not limited to that embodiment. In fact, count 1 is not even limited to an adhesive, but to a gripping substance, which, according to the express teaching of the patent, can be a pressure-sensitive adhesive. Consequently, the claims are broad enough to read on use of a pressure-sensitive adhesive that avoids such contact with the fur as would damage it.

We are satisfied that the desired result naturally flows from Hull's teaching, which concerns pressure-sensitive adhesives. Although Pingree argues that Hull's disclosure does not exclude an adhesive that adheres to guard hairs but not to fur, Pingree's counsel admitted at oral hearing that such an adhesive would not include pressure-sensitive adhesives. One of ordinary skill in the art reading Hull's disclosure would assume that such an adhesive is not contemplated by Hull because of the absence of an express teaching concerning use of that *type* of adhesive, much less a *specific* adhesive.

Furthermore, even where a flowable adhesive is described in the patent, it appears that the only contact avoided is that which would damage the fur. Thus, Fig. 2 and the related disclosure show that the skin supported by a first plate is brought into contact with the adhesive supported by a second plate with sufficient pressure to compress four springs, which urge the plates together with "a substantially *uniform pressure* across the entire skin." (Emphasis add-

ed.)[2]  Obviously, the pressure must be adjusted to avoid damaging the fur—the identical technique employed by appellee.

 In view of the foregoing, we hold that Hull's application inherently discloses avoiding such contact with the adhesive as will damage the fur.

We also agree with the board's holding that Pingree suppressed the invention of the counts. The over ten year delay between actual reduction to practice in 1957 and the filing date appears excessive, particularly in view of Pingree's furnishing a patent attorney in 1962 with various drawings and descriptions which are essentially those contained in Pingree's application; then waiting 5½ years to file the patent application upon being spurred to such action by information that an opponent had entered the field of adhesive unhairing. We note that Pingree's brief offers no explanation for the 5½ year delay, although in 1966 it was decided to build a machine incorporating improvements neither required by the counts nor disclosed in the patent application. Instead, the brief merely argues that the invention was unknown to the senior party until just prior to the filing date. However, the record provides ample support for the board's finding that the invention defined by the counts was reduced to practice many years earlier. These circumstances raise an inference of intent to suppress that appellant has not overcome. See *Young* v. *Dworkin,* 489 F.2d 1277, 1281 n. 3, (Cust. & Pat. App. 1974).

Accordingly, the decision of the board is affirmed.

Affirmed.

---

2.  The specification further states that "[t]he thickness of the coating of [adhesive] . ., the temperature . . ., and the *pressure* applied . . . are all such that [the adhesive] . . . will flow around that part of [the] guard hair . . . located beyond [the] fur . . . but will not flow into [the] fur. . . ." (Emphasis added.) This must be taken to mean merely that the flow is insufficient to damage the fur in view of the earlier disclosure that "[t]he particular gripping substance . . . employed should not be of such a thin consistency that it flows into the fur itself, for this would result in an undesirable removal of fur as well as guard hair."