Robert L. PEELER et al., Appellants,

v.

David R. MILLER, Appellee.

Patent Appeal No. 76–503.

United States Court of Customs and Patent Appeals.

June 10, 1976.

C. J. Tonkin, San Francisco, Cal., attorney of record, for appellants.

Herbert B. Roberts, St. Louis, Mo., attorney of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

The senior party, Peeler, Godfrey, and Furby (Peeler),[1] appeals from the decision of the Patent and Trademark Office (PTO) Board of Patent Interferences (board), one member dissenting, awarding priority of in-

---

1. Involved on U.S. Patent No. 3,591,506, entitled "Functional Fluids Containing Halocarbons for Preventing Cavitation Damage," is-sued July 6, 1971, on an application filed January 4, 1968. The patent is assigned to Chevron Research Company.

vention in five counts to the junior party, Miller.[2]  We reverse.

### The Subject Matter

Counts 6 and 8 adequately describe the subject matter:

6.  A power transmission fluid consisting essentially of a major portion of a phosphate ester having a tendency to cause cavitation erosion damage, and as an additive effective in reducing such damage, from 0.01 to 10% by weight of a halocarbon containing only halogen atoms and at least one carbon atom having a boiling point below 75°C, wherein the halogen substituents on said halocarbon are chlorine, bromine or fluorine or combinations thereof.

8.  A method of inhibiting cavitation damage to a hydraulic system utilizing a hydraulic fluid consisting essentially of a major portion of a phosphate ester, which method comprises maintaining in said hydraulic fluid by addition 0.01 to 10% by weight of a halocarbon containing only halogen atoms and at least one carbon atom having a boiling point below 75°C, wherein the halogen substituents on said halocarbon are chlorine, bromine or fluorine or combinations thereof.

### The Evidence

Peeler took no testimony and relied on his filing date.  Miller submitted testimony in the form of affidavits (by stipulation) from himself, various Monsanto colleagues, and William Black, the Monsanto patent attorney who prepared and filed Miller's application.  Miller's efforts, culminating in this invention, began in the fall of 1964 when he became aware of serious hydraulic valve leakage in British "Trident" aircraft using Monsanto's SKYDROL 500A brand hydraulic fluid.  He concluded that cavitation[3]

was responsible for the problem and began the search for a fluid additive to overcome the problem.

In 1965, in ultrasonic vibrating probe tests, in which a soft metal tip is vibrated at high frequency in a beaker containing SKYDROL 500A and the additive under test and the loss of metal from the tip measured, it was found that water as an additive would reduce cavitation damage substantially.  This laboratory finding was confirmed in use in the Trident aircraft.  In March 1966 Miller thought of using FREON 11 (the DuPont trademark for trichloromonofluoromethane) as the additive and also other halocarbons, which are fire-resistant and, like water, have high volatility in relation to the base fluid, as anti-cavitation additives.  On March 8 Miller instructed a colleague (Stainbrook) to conduct ultrasonic vibrating probe tests using FREON 11 as the additive.  Stainbrook performed one control run and one run with FREON 11 as the additive on that day.  Stainbrook's affidavit and Miller's March 14 notebook page indicate that FREON 11 significantly reduced erosion of the probe tip in the experiment.  In his notebook entry Miller indicated, "To better assess such additives, we are setting up hermetically sealed sample containers."  The record does not show that hermetically sealed containers were subsequently used by Miller.

On April 5, 1966, Miller submitted a "preliminary disclosure of invention," which his superiors in the Research Department of Monsanto's Organic Chemicals Division rated "A (Ready [to file])" on April 18, 1966.  Presumably, this disclosure was forwarded to Monsanto's patent department for action soon thereafter, but the record does not show when this occurred.

From the time when Miller's invention disclosure was rated "A (Ready)" more than

---

2.  Involved on application serial No. 32,344, filed April 27, 1970, entitled "Functional Fluid Compositions Containing Fluro Alkanes," which is assigned to Monsanto Company.

3.  "Cavitation" may be defined as "Formation of gas—or vapor-filled cavities within liquids by mechanical forces; * * *; specifically,

the formation of vapor-filled cavities in the interior or on the solid boundaries of vaporized liquids in motion where the pressure is reduced to a critical value without a change in ambient temperature." *McGraw-Hill Dictionary of Scientific and Technical Terms* 237 (1974).

four years elapsed until Miller's filing date. Miller continued working on cavitation inhibitors of undisclosed nature during this time, and in September 1966 he gave presentations at several U.S. aviation industry meetings on Monsanto's solution of the Trident valve damage problem. Stainbrook stated that he ran vibrating probe tests in October 1967 using FREON 112(a) (apparently tetrachlorodifluoroethane) as the additive and that he informed Miller of his results. What Miller did with this information is not indicated in the record. Meanwhile, there is no evidence of action in Monsanto's patent department until the arrival of Mr. Black in October 1968, some two and a half years after Miller's alleged actual reduction to practice. Mr. Black's affidavit states in material part:

> He was employed by Monsanto on October 14, 1968. He was assigned responsibility for the following areas:
>
> Petroleum Additives
> Functional Fluids
> Polyphenyl Ethers
> Synthetic Lubricants
>
> He was assigned four areas because the three attorneys who had previously handled them had resigned in the previous four months.
>
> He recalls that as of January 1969 he was responsible for:
>
> 1) about 60 to 70 pending U.S. Applications
>
> 2) over 400 foreign pending applications
>
> 3) over 100 active invention disclosures of which
>
> 27 were A—ready to file
> 21 were A—not ready to file
>
> He recalls that as of that date, [Miller's] invention disclosure * * * was in order of filing priority, 31st on the list out of 48 cases.
>
> He generally filed invention disclosures according to their order of priority.

4. A person shall be entitled to a patent unless—

    \*    \*    \*    \*    \*    \*

*The Board Opinions*

The board majority found that Miller had actually reduced the invention of the counts to practice in April 1966 and that he had not abandoned, suppressed, or concealed the invention within the meaning of 35 U.S.C. § 102(g).[4] The majority found that Miller's March 1966 vibrating probe tests were sufficient to show that the invention was suitable for the use set forth in the counts, i. e., cavitation inhibition in hydraulic systems. The tests were held not to have been abandoned experiments. The majority rejected Peeler's claim that Miller had suppressed the invention, on the basis that there was no evidence that Miller intended to suppress the invention or in fact did so.

The dissenting member disagreed on both the reduction to practice and suppression issues. He concluded that the single probe test using FREON 11 as the additive was insufficient to establish reproducibility of results, citing *Conner v. Joris,* 241 F.2d 944, 44 CCPA 772 (1957), and that Miller's March 14 notebook entry, quoted in part supra, showed that Miller believed he had a "lead," not an actual reduction to practice, which required further experimentation "to better assess such additives." The dissenter viewed the inactivity at Monsanto after the purported reduction to practice, coupled with Stainbrook's 1967 experiments, to indicate a lack of conviction of success by those in authority at Monsanto, and he concluded that the March 1966 tests constituted abandoned experiments. On the suppression issue, the dissenter commented:

> * * * I also believe that the patent statutes were not designed to protect a first inventor who slumbers, to the detriment of a second inventor who tries to disclose his invention to the public and this I believe is what we have before us.

He concluded that the delay at Monsanto was "an unreasonable delay analogous to 'res ipsa loquitur' transferring the burden of proof to Miller to prove that the inven-

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. * * *.

tion *was not* suppressed, concealed, or abandoned under the provisions of 35 USC 102(g)." (Emphasis in original.) The dissenter relied on the majority and concurring opinions—the latter by the author of this opinion—in *Young v. Dworkin,* 489 F.2d 1277 (CCPA 1974) to support this conclusion.

## OPINION

While we agree with the board majority that Miller proved by a preponderance of the evidence [5] that he had actually reduced the invention to practice in March 1966, we also agree with the dissenting member of the board that Miller must be deemed to have suppressed the invention under 35 U.S.C. § 102(g) through the behavior of his assignee. Perforce, the decision of the board must be reversed. We reach both issues, since without an actual reduction to practice there is no invention in existence which can be abandoned, suppressed, or concealed under § 102(g). *Bogoslowsky v. Huse,* 142 F.2d 75, 31 CCPA 1034 (1944).

## I

Peeler argues that the one successful vibrating probe test relied upon by Miller to establish an actual reduction to practice was preliminary in nature and failed to show that the invention would work "as intended to work in its practical contemplated use, i. e., as an aircraft hydraulic fluid * * *." Peeler also urges us to find that a single successful test is insufficient to establish reproducibility of results and that the probe test was an abandoned experiment because Miller lacked conviction of success. Connected with these arguments is Peeler's contention that Miller is attempting to prove actual reduction to practice *nunc pro tunc* by relying on an affidavit by his colleague Fairing which, Peeler submits, presents Fairing's opinion

as of 1973, when it was executed, and not at the time of Miller's reduction to practice in March 1966.

We note that the counts are not directed to aircraft hydraulic systems, which are special environments with high speed flow and extremes of temperature and pressure causing accelerated wear of valves and other hydraulic system components, but to hydraulic systems generally. Thus Miller need show only that his invention is suitable for reducing cavitation damage in any hydraulic system. See *Steinberg v. Seitz,* 517 F.2d 1359, 1363 (CCPA 1975), and cases cited therein. We find Peeler in a peculiarly unfavorable position to assert that the vibrating probe test is insufficient to prove actual reduction to practice. The only tests disclosed in Peeler's examples illustrating his invention are probe tests, and it is these tests upon which Peeler is in effect relying to show a constructive reduction to practice by the application which matured into his patent. See *Blicharz v. Hays,* 496 F.2d 603 (CCPA 1974). Miller's March 14 notebook entry and the 1971 Monsanto brochure on "Aircraft Valve Life" do not suffice to show that the vibrating probe test was inadequate to demonstrate suitability of the FREON 11 additive for reducing cavitation damage in hydraulic systems *generally.* The Monsanto brochure is specifically addressed to testing additives for use in aircraft. Thus, it may be true that the vibrating probe test is a rapid screening method for choosing candidates for more rigorous testing, but that does not vitiate the conclusion by Miller, corroborated by Fairing,[6] that the vibrating probe test was considered in 1966 by those in the art, based in part on the knowledge that the success of water as an additive was predicted by the probe test, to simulate conditions which would cause valve damage in aircraft. This is more than ample nexus be-

---

5. The applicable standard of proof since Miller's application was copending with the application that matured into Peeler's patent. *Frilette v. Kimberlin,* 412 F.2d 1390, 56 CCPA 1242 (1969).

6. Fairing stated that in 1964 he "knew the literature taught that laboratory tests using the vibrating probe method correlate well with the performance of tested materials in the field," and referred to an article dated 1956 saying the same thing.

tween the test conditions and the intended functional setting contemplated by the counts. *Stencel v. Nordine,* 481 F.2d 916 (CCPA 1973). Miller's comment in the March 14 notebook entry indicating a need "to better assess such additives" does not, it seems to us, indicate that he considered FREON 11 unsuitable. In the same notebook entry Miller also said (emphasis ours):

> Low boiling additives have generally exhibited marked damage-reducing tendencies in the ultrasonic probe tests, *even though no special precautions were taken to prevent loss of volatiles.*

Thus, hermetically sealed containers were not necessary for successful probe tests, and Miller knew it. Miller is not required to prove that FREON 11 was known by him to be a commercially practicable additive for use in aircraft in order to establish an actual reduction to practice. *Steinberg v. Seitz,* supra, and cases cited therein. Miller's record, unrebutted by Peeler, suffices to show that the vibrating probe test was an adequate means for determining the suitability of FREON 11 as a cavitation damage reducing additive. Peeler has adduced no evidence to show that other tests are necessary. See *Campbell v. Wettstein,* 476 F.2d 642, 647 (CCPA 1973).

We are not disposed to hold that the single probe test was insufficient to show reproducibility of results. This invention is not in a notoriously unpredictable field like catalytic chemistry. The prior experience with water as an additive created confidence in the efficacy of the probe test. On the basis of all the evidence and the relative simplicity of the invention, see *Patterson v. Hauck,* 341 F.2d 131, 52 CCPA 987 (1965), we find unpersuasive Peeler's argument that a series of probe tests was necessary to establish an actual reduction to practice. This case is distinguishable on its facts from *Conner v. Joris,* supra, which was concerned with a process for oxidizing cumene. Conner knew that the prior art processes produced low yields of cumene hydroperoxide mixed with other reaction products. Conner had the burden of proving priority beyond a reasonable doubt. The evidence showed that Conner had performed two

runs within the scope of the count and that one of those runs was unsuccessful. Further, there was no contemporaneous evidence that Conner considered the other run successful. In light of the high standard of proof required of Conner the court concluded that he had not proven an actual reduction to practice. The court specifically adverted to the burden of proof as a factor in its conclusion, comparing the case with *Reiners v. Mehltretter,* 236 F.2d 418, 43 CCPA 1019 (1956). In this case the evidence supports by at least a preponderance the conclusion that a single probe test, consisting of a control run and a run with additive in the fluid, is sufficient to demonstrate to a reasonable certainty whether a particular additive will reduce cavitation damage in a hydraulic system. Peeler had ample opportunity to submit rebuttal evidence but failed to do so, placing his faith in the arguments of counsel, which are not evidence. *In re Scarbrough,* 500 F.2d 560 (CCPA 1974).

■ The Fairing affidavit and other evidence also lead us to conclude that Miller does not seek to establish actual reduction to practice *nunc pro tunc,* which this court held was impossible in *Langer v. Kaufman,* 465 F.2d 915, 59 CCPA 1261 (1972) and *Heard v. Burton,* 333 F.2d 239, 51 CCPA 1502 (1964). At the time of the work relied upon by Miller to prove actual reduction to practice, Miller's notebook entry indicates that Miller recognized that FREON 11 would work. The notebook entry is signed by Miller and witnessed by one Wygant, whose affidavit stating that he read and understood the notebook page on April 5, the day Miller filed his invention disclosure, is of record. The statement in the Fairing affidavit quoted supra note 6 speaks to what persons of ordinary skill in this art would have known in 1966 and before, although the affidavit was executed in 1973. The affidavit is competent as corroboration and otherwise under the rule of reason of *Berry v. Webb,* 412 F.2d 261, 56 CCPA 1272 (1969), to the extent that it refers to matters known to or observed by the affiant contemporaneous with or prior to the date

of actual reduction to practice relied on by Miller, where it is propounded as evidence of the level of knowledge in the art at the time the invention was made. This situation is not like those in *Langer* and *Heard,* where the evidence showed that while the unsuccessful appellants had in fact practiced the inventions there in issue, there was no evidence of contemporaneous appreciation of what had been done. The record is clear in this case that Miller recognized the success of FREON 11, and that persons of ordinary skill in the art would have recognized FREON 11 as a success, from the probe test results. See *Spero v. Ringold,* 377 F.2d 652, 54 CCPA 1407 (1967).[7]

▆▆ Finally, we hold that the March 1966 probe test was not an abandoned experiment. Except for Miller's September 1966 presentation, the record is devoid of any activity with respect to the invention by Miller personally after he filed the invention disclosure. This lack of activity is understandable in light of the realities of corporate research. Once he filed his invention disclosure with his superiors, Miller was finished with the invention. He had other work to do. If Monsanto desired protection for its employee's invention, any further action was in the hands of people other than Miller. That Stainbrook performed tests in 1967 on additives which the dissenting board member said were outside the scope of the counts is of no moment. There is no evidence that Miller changed his mind about the efficacy of the additives he found. In some cases the passage of a long period between reduction to practice and filing raises an inference that the purported reduction to practice was an abandoned experiment. See, e. g., *Bowers v. Valley,* 149 F.2d 284, 32 CCPA 1039 (1945). This inference, however, only arises where there is doubt that the activities relied on constitute a reduction to practice. *Walkup v. Greig,* 332 F.2d 800, 52 CCPA 701 (1964), and cases cited therein. We have no reason to doubt that Miller considered his invention successful when he filed his invention disclosure; subsequent corporate inactivity does not raise the inference that *Miller* later thought his work incomplete or unsuccessful. As indicated infra, this passage of time redounds to the detriment of Monsanto, but not because of an inference that there was no reduction of the invention to practice.

II

▆▆ Determining whether a de facto first inventor, Miller in this case, should also be considered the de jure first inventor under § 102 requires resolution of the policy question: which of the rival inventors has the greater right to a patent? *Brokaw v. Vogel,* 429 F.2d 476, 57 CCPA 1296 (1970). Under the facts of this case and the public policy inherent in § 102(g), we hold that the evidence has raised an inference of suppression of the invention by Miller's assignee, Monsanto, the real party in interest, which has not been rebutted. Monsanto's conduct is, of course, imputable to Miller under elementary legal principles. *In re Clark,* 522 F.2d 623 (CCPA 1975); *Wilson v. Goldmark,* 172 F.2d 575, 36 CCPA 849 (1949).

▆▆ The evidence here is striking in its paucity. There is no evidence that Miller (or Monsanto) was spurred into filing his application by knowledge of Peeler's invention; spurring, however, is not an essential element of suppression. *Young v. Dworkin,* supra. Neither Miller nor anyone else at Monsanto appears to have had any specific intent to suppress or conceal the invention. But proof of specific intent to suppress is not necessary where the time between actual reduction to practice and filing is unreasonable. This unreasonable delay may raise an *inference* of intent to suppress. *Pingree v. Hull,* 518 F.2d 624 (CCPA 1975); *Young v. Dworkin,* supra, 489 F.2d at 1281 n. 3. The evidence shows, however, that over four years elapsed between the rating of Miller's invention disclosure "A (Ready)" and Miller's filing date and that much, if not all, of the delay occurred while the

---

7. We reject the argument that the probe test does not establish reduction to practice of method counts 8–10. The test is sufficient to show that adding FREON 11 to SKYDROL 500A is a method of reducing cavitation damage in hydraulic systems.

disclosure lay dormant in Monsanto's patent department.

In our opinion, a four-year delay from the time an inventor is satisfied with his invention and completes his work on it and the time his assignee-employer files a patent application is, prima facie, unreasonably long in an interference with a party who filed first. The circumstances surrounding the delay and Monsanto's attempted justification thereof serve only to persuade us of the correctness of our opinion. We make no criticism of Mr. Black; getting Miller's application filed in the time he did may have been an extraordinary effort. Monsanto, however, can take no comfort in that, since its neglect of Miller's application for the 2½ years preceding Mr. Black's arrival and its failure to replace two of the three attorneys who resigned were at least partial causes of the backlog which greeted Mr. Black.[8]

In its brief, Monsanto attempts to justify its inaction as follows:

Although delay in filing was encountered as set forth in the affidavit of William T. Black * * * the invention disclosure was handled in accordance with established Monsanto practices which is [sic] consistent with normal business practices. At the invention disclosure review meetings, which were conducted approximately semi-annually, Dr. Miller, and his immediate superior, Dr. Richard, consistently urged that a patent application be filed. The fact that the invention disclosure rating was never changed from "A-Ready to file" is indicative of the fact that Miller intended to get an application on file as soon as his patent attorney could do so.

This excuse is lame on two counts: First, there is no evidence of what Monsanto's "established practices" were or that the review meetings ever took place. We will not accept statements in briefs as substitutes for evidence. Second, and more importantly, assuming the truth of Monsanto's assertions, we do not consider this four-year delay to be in accordance with any "normal" business practice that we should accept as part of a sound patent system.[9] Whether Monsanto's behavior is, in fact, a normal business practice is immaterial. Concepts of normality in business, and in patent law, change; that a practice is normal does not mean that it is one that courts should approve. We certainly cannot approve of the supine attitude toward delay exhibited by the statement in Monsanto's excuse, supra, that the "delay in filing *was encountered*" (emphasis ours), as though it had been come upon by surprise. The record, however, contains nothing to show that the delay was other than fully within Monsanto's control at all times.

Miller and the board majority rely heavily on the statement, often repeated in varying language by this court, that "Mere delay, without more,[10] is not sufficient to establish suppression or concealment." *Young v. Dworkin,* supra, 489 F.2d at 1281, and cases cited therein. What we are deciding here is that Monsanto's delay is not "mere delay" and that Monsanto's justification for the delay is inadequate to overcome the inference of suppression created by its excessive delay. Surely, the word "mere" does not imply a total absence of a limit on the duration of the delay. "Mere" is a chameleonic word, whose meaning depends on the circumstances. *Black's Law Dictionary* (Rev. 4th ed. 1968) 1139 defines "merely" as follows:

Without including anything else; purely; only; solely; absolute[ly]; wholly. *In re Plymouth Motor Corporation,* Cust. &

---

**8.** It is appropriate to wonder why, if Mr. Black could get to and file Miller's application in approximately 15 months, the three attorneys whom he replaced could not have completed it in much less time after it was marked "A (Ready)" in April 1966.

**9.** Furthermore, we cannot believe that anyone, let alone a sophisticated corporation like Monsanto, would consider letting four years pass as a normal or prudent business practice, in light of the encouragement to early filing inherent in 35 U.S.C. § 102(b), for example.

**10.** The addition of "without more" to "mere" seems to be a redundancy of the kind to which lawyers are peculiarly prone.

Pat.App. [, 18 CCPA 838, 841], 46 F.2d 211, 212 [, 8 USPQ 14, 15 (1931)].

As Mr. Justice Holmes said in *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918), "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." The living thought clothed by the phrase "mere delay" is not susceptible of discernment as an absolute matter. Whether any delay is "mere" in contemplation of law is a policy decision that can be made only on a case-by-case basis. A delay may be of no legal consequence because it is not long enough. Or the delay may be excused by activities of the inventor or his assignee during the delay period. See, e. g., *Frey v. Wagner,* 87 F.2d 212, 24 CCPA 823 (1937). There may be other factors. But as we intimated in *Pingree v. Hull,* supra, in line with our warning in *Young v. Dworkin,* supra, that "one who delays filing his application does so at the peril of a finding of suppression or concealment due to the circumstances surrounding the delay," the unreasonable length of a delay *may* be ample circumstance in itself to find suppression. At least since *Mason v. Hepburn,* 13 App. D.C. 86 (1898), the courts have implemented a public policy favoring, in interference situations, the party who expeditiously starts his invention on the path to public disclosure through the issuance of patents by filing a patent application. This policy is now implemented through § 102(g) even as it was in *Mason v. Hepburn* prior to that statute, by denying de jure first inventor status to de facto first inventors who, or whose assignees, frustrate this policy.

We conclude that Monsanto's delay was not "mere delay," that the delay was excessive, and that as between Peeler and Miller, Peeler has the better right to a patent, on the statutory ground that Miller, through the acts of his assignee, suppressed the invention. The decision of the board is reversed.

*REVERSED.*

MILLER, Judge (concurring).

I agree that appellee reduced the invention to practice and that, through the acts of his assignee, he suppressed the invention. Under 35 U.S.C. § 102(g), a second inventor is not entitled to a patent unless the first inventor abandoned, suppressed, or concealed the invention. In an interference the burden of proving abandonment, suppression, or concealment falls on the second inventor, regardless of who filed first. *Young v. Dworkin,* 489 F.2d 1277, 1279 (CCPA 1974).

This court has consistently held that suppression or concealment, to amount to forfeiture of the right to a patent in favor of a later inventor, must be deliberate or intentional. *Pingree v. Hull,* 518 F.2d 624, 629 (CCPA 1975); *Young v. Dworkin, supra* at 1280–81; *Woofter v. Carlson,* 367 F.2d 436, 54 CCPA 917, 930 (1966), *cert. denied, AMP Inc. v. General Motors,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967); *Dewey v. Lawton,* 347 F.2d 629, 632, 52 CCPA 1573, 1577–78 (1965); *Schnick v. Fenn,* 277 F.2d 935, 941, 47 CCPA 1174, 1183 (1960); *Gallagher v. Smith,* 206 F.2d 939, 947, 41 CCPA 734, 745 (1953). *Young v. Dworkin,* however, was a harbinger of the outcome of this case. It was not redundancy[1] when, speaking for the majority of this court, I wrote "Mere delay, without more, is not sufficient to establish suppression or concealment." *Mere* delay is to be contrasted with *excessive* or *unreasonable* delay, which, without more, is sufficient to establish suppression or concealment. The four-year delay in this case, without more, is excessive.

Such delay, however, only gives rise to an *inference* of intent to suppress. *Young v. Dworkin, supra* at 1281 n. 3. It shifts the burden to the first inventor to explain the

1. The error of the superfluous comment in footnote 10 of the majority opinion is demonstrated by the statement of the obvious in the opinion itself: "Surely, the word 'mere' does not imply a total absence of a limit on the duration of the delay." The language in *Young v. Dworkin* was taken from *Gallagher v. Smith,* 206 F.2d 939, 946, 41 CCPA 734, 743 (1953).

delay by showing that there was no intent to suppress. Appellee has failed to do so since he has presented virtually no evidence covering the two-and-a-half year gap between reduction to practice and the arrival of attorney Black. This failure decides the case.

The majority indulges in dictum which would engraft onto the statute a policy "favoring . . . the party who *expeditiously* starts his invention on the path to public disclosure . . . by filing a patent application." (Emphasis added.) It implies that the failure to hire a sufficient number of attorneys to deal with a backlog of patent applications results in forfeiture of the patent right to one who has been "expeditious." However, not even diligence is required after reduction to practice. *Bowers v. Valley,* 149 F.2d 284, 287, 32 CCPA 1039, 1045 (1945).

The public policy referred to in *Brokaw v. Vogel,* 429 F.2d 476, 480, 57 CCPA 1296, 1301 (1970), is that prescribed by Congress in § 102(g). The party with the right to a patent is the first inventor unless he has abandoned, suppressed, or concealed the invention. The policy is concerned with the action or inaction of the first inventor—not that of his opponent. Brokaw was awarded "priority" by the court "because he is the one who was the first to start the invention on its way to being disclosed to the public *and because,* so far as the record here shows, *the public would never have gained knowledge of it through the efforts of Vogel.*" (Emphasis added.)

The "expeditious" standard created by the majority is not the standard of deliberate or intentional suppression required by the statute. Nor do the cases cited by the majority support it. In *Pingree v. Hull, supra, intent* to suppress was found as a result of a five-and-a-half year delay and spurring; similarly, in *Young v. Dworkin, supra, intent* to suppress was found as a result of a two-and-a-half year delay during which the inventor prepared for commercial production. If the standard prescribed by the statute is to be changed, that is a matter for the Congress. *In re McKellin,* 529 F.2d 1324, 1332 (CCPA 1976) (Markey, C. J., concurring).